No. 90,532

STATE OF KANSAS, *Appellee*, v. ROBERT HENRY LACKEY II, *Appellant*.

(120 P.3d 332)

Cert. denied ___ U.S. ___ (2006)

Opinion filed September 30, 2005.

*Patrick H. Dunn,* assistant appellate defender, argued the cause and was on the brief for appellant.

*John K. Bork*, assistant attorney general, argued the cause, and *Kristafer R. Ailslieger*, assistant attorney general, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Robert Henry Lackey, II, was convicted by a jury of one count of premeditated first-degree murder in violation of K.S.A. 21-3401(a) (Ensley 1981) and one count of rape in violation of K.S.A. 21-3502 (Ensley 1981), for crimes committed in December 1982. Pursuant to K.S.A. 1982 Supp. 21-4504 of the Habitual Criminal Act (HCA), his sentence was enhanced to two consecutive terms of life imprisonment and 45 years to life. He appeals directly to this court pursuant to K.S.A. 22-3601(b)(1).

In 1982, the victim, S.B., was a 22-year-old college student who met the defendant while she was doing volunteer work at the Gospel Mission (Mission) in Salina. The defendant was a transient who was staying at the Mission and working as a cook, and he was known as Bob Moore. S.B. and the defendant developed a friendship which involved socializing outside of the Mission with friends Mark and Dora Foster. In November 1982, the defendant indicated to Mark that he wanted to date the victim, but she had rebuffed his sexual advances indicating that she only wanted to be friends. This upset the defendant and made him angry.

In December 1982, S.B. was living in a trailer park in Salina. She had been dating Jay Czarnowski exclusively for about a year, and he had a key to her residence. They had been having problems and had an understanding that they could date outside of their relationship; however, Czarnowski did not know that S.B. had done so. On Thursday, December 9, 1982, Czarnowski and S.B. got into an argument at her residence about his plans to go home for the weekend. They made up that evening and had unprotected vaginal or anal intercourse. Czarnowski went home to Lincolnville on Friday, December 10, 1982.

On that day, S.B. spoke with her mother and sister on the telephone regarding their plans to visit S.B. for Christmas. S.B.'s mother then tried to call S.B. several times throughout the next week, but S.B. did not answer. At S.B.'s parents' request, the trailer

park landlord checked S.B.'s mobile home the following Thursday but did not find her.

On December 11, 1982, Pamela Chavez (now Bishop) went to work around 4 p.m. at a local tavern as a bartender. The defendant was drinking and playing pool, and he introduced himself to Chavez. She served him two pitchers of beer before he asked her to call him a cab between 6 and 7 p.m. He told Chavez that he was drunk, and he left a note for his friend Dora Foster who worked at the tavern saying that he was "messed up."

Wenda Huehl (now Plunkett) arrived at the tavern between 5:30 and 6:30 p.m. to visit Chavez. Huehl saw Chavez playing pool with the defendant and remembered that the defendant later asked Chavez to call him a cab to the trailer park where S.B. lived. Huehl specifically recalled the name of the trailer park because she lived across the street from it and had considered offering the defendant a ride, but the cab had already been called.

Yellow Cab radio logs indicated that cab driver Harvey McIntyre picked up a fare at 6:17 p.m. on December 11, 1982, from the tavern and took the fare to a convenience store about a block and a half from S.B.'s residence. McIntyre described the fare at trial as a white, slender male, in his twenties with dark hair, a little taller than himself, wearing a ball cap. The logs also indicated that a fare was picked up by cab driver William Letterman from the convenience store at 10:50 p.m. and the fare was taken to the Mission. At the time of the November 2002 trial, Letterman was deceased and his statements were admitted over objection through the testimony of a retired Salina police officer.

Although also deceased at the time of trial, Reverend George Knight told investigating officers in 1982 that he recalled that the defendant had returned to the Mission around 10 or 11 p.m. on December 11, 1982. Knight smelled alcohol on his breath but did not say anything. Knight went home and assumed the defendant was going to bed. When Knight arrived the next morning at 7:30, he was surprised to discover the defendant and his personal belongings were gone. A pair of men's underwear was subsequently found underneath the defendant's bed at the Mission.

Czarnowski returned to Salina either on the following Sunday or Monday, December 12 or 13, 1982. He recalled stopping by S.B.'s residence to see her, but she was not home. He could not recall if he went inside. Czarnowski returned to the residence the next several days looking for S.B., spoke with her neighbors, and looked for her at the Mission and several taverns. He spoke with Mark Foster indicating he was worried that she might have gone somewhere with the defendant because he would be able to take her out of the state. Czarnowski spent several nights at the trailer during the week, but he did not remember doing any housekeeping or picking up or opening of S.B.'s mail during this time. He did not go into the back bedroom that was used for storage.

By Friday, December 17, 1982, Czarnowski concluded that S.B. had left, and he decided that he was going to move his belongings out of her mobile home. He spent that night in the front bedroom and his friend Duane Newirth slept in the living room. While moving his belongings the next morning, Czarnowski discovered S.B.'s body in the closet of the back bedroom when he was looking for a stereo speaker. Czarnowski and his friend called the police.

At 12:55 p.m. on December 18, 1982, Salina police officers responded to the scene and discovered S.B.'s body in the closet of the back bedroom. S.B. was wearing socks and underwear and her jeans were pulled down around her ankles. She had noticeable bruising around her neck. Several items were blocking the closet doors where she was found.

Dr. Erik Mitchell and Officer Joseph Garman testified that the higher the temperature, the faster the decaying of a body process occurs. Although the thermostat was set at 80 degrees in the mobile home, Officer Garman did not smell the odor of a decaying body. However, there was a cold air return vent in the floor of the closet where the body was found. Officer Garman turned the thermostat down to 68 degrees to prevent the body from decaying.

Saline County Coroner Dr. David Clark arrived at the scene and made arrangements for an autopsy. Based on his observations at the scene, Dr. Clark opined that S.B. had died of strangulation and had been dead 6 to 8 days. Dr. William Eckert, who was deceased at the time of trial, performed the autopsy on December 20, 1982,

and prepared a report. The State's expert, Dr. Mitchell, reviewed Dr. Eckert's report in conjunction with other evidence from the scene and over a hearsay objection testified that the cause of death was strangulation and that the death had occurred at least 1 or 2 days prior to the body's discovery, but the maximum time could have been considerably longer.

Officers found two pieces of paper on the kitchen wall which contained the names Bob Walston and Jim Hemmy (her landlord) and the telephone numbers for the tavern and a cab company. Several other papers and letters were collected from the scene, including an empty envelope addressed to S.B. and postmarked December 13, 1982, from Lincolnville. A small unopened envelope was also found in the residence which was postmarked "Fort Scott, Kansas, December 16, p.m., 1982." Salina Deputy Police Chief Barry Plunkett testified that letters found at the scene would routinely be opened during an investigation, but he could not recall whether the mail was opened in this case.

Officer Garman spoke with Czarnowski at the scene. During that conversation, Czarnowski indicated that S.B. had worked with someone named "Bob" at the Mission, who had made it known that he had "the hots" for her. Although an investigation was pursued, the case eventually went inactive until Kansas Bureau of Investigation (KBI) Special Agent Ron Hagen and Salina Police Detective Paul Forrester resumed the investigation in November 1996. They received information from Canadian authorities that a Robert Moore was involved in a 1982 homicide in Salina. Through the use of two social security numbers provided by the Canadian authorities, investigators learned the name Robert Lackey. Czarnowski and Mark Foster later identified a 1979 photograph of Lackey as the person they knew as Robert Moore. DNA testing of the body fluids on the underwear found under the defendant's bed was consistent with the fluids found in the victim's rape kit.

Armed with an arrest warrant, Hagen and Forrester tracked the defendant to Alabama where they interviewed him at the Sumpter County, Alabama, Sheriff's Department. Prior to his *Miranda* warnings being given, the defendant said that he had never been to Kansas when he was advised that someone named Robert Moore

was using his social security number in Kansas. He subsequently said that he did not know S.B. or Robert Moore, but he may have been in Kansas in 1969 or 1970. The defendant's pretrial motion to suppress his statements made before *Miranda* warnings was denied. In March 2002, the defendant was extradited to Kansas and his blood was drawn for DNA testing purposes.

DNA testing was performed on vaginal, anal, and oral swabs taken from S.B., scrapings from under her fingernails, and a cutting from the underwear found under the defendant's bed at the Mission and compared with known bloodstains of the defendant and Czarnowski. Expert testimony established that the sperm cells found in S.B.'s vagina and on the cutting from the underwear were consistent with the defendant's DNA. The estimated probability of selecting an individual at random from the general unrelated Caucasian population was 1 in 194 billion. Moreover, the defendant could not be excluded as a partial contributor to the DNA profile from the victim's fingernail scrapings, but Czarnowski was eliminated.

The defendant was convicted by a jury of premeditated first-degree murder and rape. Pursuant to the HCA, the defendant's sentence was enhanced to two consecutive terms of life imprisonment and 45 years to life. The defendant's posttrial motions for a new trial and judgment of acquittal were denied.

On appeal, the defendant asks this court to reverse his convictions based upon the following claims: (1) The admission of hearsay statements in violation of the Confrontation Clause; (2) the denial of a continuance to obtain an exculpatory witness; (3) the admission of Dr. Mitchell's expert opinion testimony based upon the autopsy performed by Dr. Eckert and the resulting violation of the Confrontation Clause; (4) the exclusion of evidence supporting the defendant's consent defense to the rape charge; (5) the admission of statements in violation of *Miranda v. Arizona,* 384 U.S. 436, 15 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1996); (6) the victim's sister's testimony denied the defendant a fair trial; (7) cumulative error; (8) the trial court's error in applying the HCA; and (9) the HCA violates *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm the defend-

ant's convictions, vacate the defendant's sentence, and remand the case for resentencing.

Hearsay and Confrontation Clause Violations

a. Statements of Deceased Cab Driver

Prior to trial, the State filed a motion of intent to present evidence of prior statements of unavailable witnesses pursuant to K.S.A. 2004 Supp. 60-460(d)(3). The State sought to admit evidence of a police interview with cab driver Letterman that occurred on December 22, 1982. After a pretrial hearing, the district court found that Letterman (deceased) was unavailable as a witness and the proffered testimony of the officer who interviewed Letterman was admissible hearsay under 60-460(d)(3). Applying *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), and *State v. Bratt*, 250 Kan. 264 Syl. ¶ 2, 824 P.2d 983 (1992), the court concluded that the proffered evidence possessed a particularized guarantee of trustworthiness, rendering the hearsay statements of Letterman admissible.

At trial, over the defendant's hearsay objection, retired police officer James Miller testified that he had interviewed Letterman regarding a fare Letterman picked up at the convenience store a block and a half from the victim's residence around 10:50 p.m. on December 11, 1982. Letterman told him the fare was a white male with short brown hair, in his late twenties or early thirties, 5'9" to 6' tall, medium build, a shadow beard, and his hair was possibly messed up. The man smelled of alcohol, but he did not appear to be intoxicated. The man appeared to be in a hurry because he opened and shut the door fast and spit out the address really fast. The defendant's posttrial motion for a new trial regarding this issue was also denied.

No dispute exists in this case that Letterman's statements fall under K.S.A. 2004 Supp. 60-460, which in relevant part provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(d) *Contemporaneous statements and statements admissible on ground of necessity generally.* A statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

However, the Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her. This constitutional provision does not preclude the admission of all out-of-court statements. *State v. Meeks*, 277 Kan. 609, Syl. ¶ 1, 88 P.3d 789 (2004). In determining the admissibility of hearsay exceptions, the court must also consider the requirements of the Confrontation Clause. 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence, Hearsay § 7.1(B) (3d ed. 2003). The Confrontation Clause can operate to bar admission of evidence that would otherwise be admissible under an exception to the hearsay rule if confrontation requirements (reliability and trustworthiness) are not met. *State v. Betts*, 272 Kan. 369, 382-83, 33 P.3d 575 (2001).

In this case, the district court admitted the hearsay testimony of Letterman based upon this court's analysis in *State v. Bailey*, 263 Kan. 685, 692-93, 952 P.2d 1289 (1998) (quoting *Bratt*, 250 Kan. 264, Syl. ¶ 1), and was in large part based upon *Roberts*, 448 U.S. 56. In *Bailey*, we found:

" 'The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. *Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness.*' " (Emphasis added.) 263 Kan. at 692-93.

However, after trial, the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), substantially altered the Confrontation Clause analysis

expressed in *Bailey* and *Roberts*. See *Meeks*, 277 Kan. at 613-14. In *Crawford*, the Court drew distinctions between testimonial and nontestimonial hearsay evidence, holding:

"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' [constitutional] design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence is as issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.* We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." (Emphasis added.) 541 U.S. at 68.

After *Crawford* was decided, this court considered in *Meeks* whether the district court erred in admitting into evidence a shooting victim's response to the investigating officer's question of who had shot him under hearsay exception 60-460(d)(3). We summarized *Crawford* as holding

"that witnesses' out-of-court statements that are testimonial are barred under the Confrontation Clause unless (1) the witnesses are unavailable and (2) the defendants had prior opportunity to cross-examine those witnesses. In other words, the *Roberts* standards of admissibility, as used by this court in *Bailey*, could not apply to testimonial statements, with the possible exception of testimonial dying declarations." *Meeks*, 277 Kan. at 614 (citing *Crawford*, 541 U.S. at 56 n.6).

Although the *Crawford* Court declined to comprehensively define what was meant by "testimonial" statements, it did describe one formulation as " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " 541 U.S. at 51-52. The Court found that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard," stressing that various forms of interrogations exist. It concluded that the defendant's wife's recorded statement, knowingly given in response to structured police questioning, qualified as an interrogation under any conceivable definition. 541 U.S. at 52-53 and n.4.

In *Meeks*, the first officer to the scene asked the victim who had shot him and the victim responded, "Meeks shot me." Minutes

later, the victim fell unconscious and subsequently died. Although we found that we need not determine whether the response was testimonial because Meeks had forfeited his right to confrontation by killing the witness, we did note that the officer "was arguably conducting an interrogation when he asked [the victim] if he knew who shot him, thus making the response testimonial." 277 Kan. at 614.

Applying *Crawford* and *Meeks* to this case, Officer Miller's interview with witness Letterman conducted during the police investigation resulted in statements that an objective witness would think would be used for trial and could arguably be construed as a police interrogation. Applying the *Crawford* test when testimonial evidence is at issue, the Sixth Amendment demands unavailability and prior opportunity for cross-examination. Letterman's death rendered him unavailable, and the defense did not have a prior opportunity to cross-examine him. As such, the district court erred in admitting evidence of Letterman's testimonial hearsay statements made during the police interview through the testimony of Officer Miller.

The State concedes that the admission of the hearsay statements was a violation of the Confrontation Clause in light of *Crawford*; however, it contends the violation was harmless error. Although the *Crawford* Court did not perform a harmless error analysis, the Tenth Circuit Court of Appeals has found that Confrontation Clause violations under *Crawford* are subject to a harmless error analysis. See *Brown v. Uphoff*, 381 F.3d 1219 (10th Cir. 2004). In *State v. Atkinson*, 276 Kan. 920, Syl. ¶ 6, 80 P.3d 1143 (2003), this court set forth the following inquiry for violations of the Confrontation Clause:

"Violation of the Confrontation Clause is subject to a [federal] harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Factors to be considered include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

The State argues the hearsay error was harmless, reasoning: (1) The testimony took up little more than 1 page out of over 400 pages of trial transcript, (2) half of the statements were cumulative because they reiterated the testimony of Edward French and the business records of the cab company establishing that Letterman picked up a fare at the convenience store, (3) the uncorroborated testimony was not particularly important because it referred only to a general description of the man and that he seemed to be in a hurry, and (4) none of the statements directly implicated the defendant.

Applying the *Atkinson* factors to this case, the testimony was important because it inferred that the cab driver picked up someone who matched the defendant's general description from a convenience store near the victim's home and the man was rushed and disheveled. Part of this testimony was cumulative, however, as the business records established that Letterman had picked up a fare at the convenience store. While the deceased witness was unable to testify, the defense was able to cross-examine Officer Miller about the fact that he did not ask Letterman if the fare had waited inside or outside in the light or shadows, about the number of fares he had driven that evening, how long his shift was or if he had a second job, whether he had been drinking that evening, or whether he wore glasses. In this manner, the defense was able to attack the credibility of the testimony in some manner.

Ultimately, as the State points out, the defendant's convictions relied not upon a few lines of hearsay from a deceased cab driver but upon the overwhelming DNA evidence and the testimonies of live witnesses putting the defendant in the right places at the right times. The admission of a few hearsay statements from the police interview with Letterman, while a violation of the Confrontation Clause, constituted harmless error under facts of this case.

### b. Expert Testimony Based on Autopsy Reports of Deceased Doctor

Dr. Clark served as the county coroner at the time of S.B.'s death, and he observed the victim's body at the murder scene. He directed that an autopsy be performed. Dr. Eckert, who died prior

to trial, conducted the autopsy and prepared the autopsy report. The autopsy report contained an external, internal, and microscopic description of the body and did not suggest the date of death. Deputy Police Chief (formerly Sergeant) Plunkett attended the autopsy and testified at trial.

As part of his coroner duties, Dr. Clark filed a written report with the clerk of the district court concerning the victim's death. The autopsy report was attached to the filed coroner's report. During Dr. Clark's testimony, the district court admitted the coroner's report but granted the defense's objection to the admission of the attached autopsy report on hearsay grounds.

The State asked Dr. Clark if he had an opinion as to the cause of the victim's death based upon his own observations and his review of Dr. Eckert's autopsy report. The defense objected on the grounds that Dr. Clark would be relying upon hearsay evidence from the autopsy report, and the State clarified to the district court that the question was based upon Dr. Clark's own inspection of the crime scene. The district court overruled that objection and a similar one concerning the time of death. Dr. Clark opined that the cause of death was strangulation and suffocation. Taking into consideration temperatures and the amount of deterioration of the body, he opined that the victim had been dead for 6 to 8 days.

Forensic pathologist and coroner of multiple Kansas counties, Dr. Mitchell testified next as an expert witness on behalf of the State. Over objection, he testified that the condition of the body was such that it could have been in the closet from December 11 to December 18, 1982, and that the cause of death was strangulation. Dr. Mitchell arrived at this conclusion based upon the autopsy report, photographs from the scene and autopsy, the toxicology report from the Kansas Department of Health, and the death certificate.

The defense objected to this testimony, arguing that it had no way of knowing how much of Dr. Mitchell's opinion as to the time of death was based on Dr. Eckert's autopsy report and that an expert witness under K.S.A. 60-456(b) cannot render an opinion as to a matter that is hearsay and not evidence before the court.

After substantial argument, the district court changed its earlier ruling and admitted the autopsy report, reasoning:

"The Court finds that [the] Dr. William Eckert, deceased, pathology report . . . performed on December the 20th, 1982, at Saint Francis Hospital, is a report of Dr. Eckert's perceptions [of the] medical examination on that date. The Court finds Dr. Eckert, obviously, is unavailable. He's now deceased. The Court finds that this is hearsay, but it's hearsay that was reasonably preserved by the declarant at a time when Dr. Eckert was making very technical medical observations. It's not subjective, in the Court's opinion. It's a—it's a medical doctor's rendition of what he observes.

"The Court finds that inherent circumstances show reliability, that it was made in good faith, with no incentive to falsify or to distort. The Court's aware of the confrontation problems which arise under *Ohio v. Roberts* and that the Court must find that there is a particularized guarantee of trustworthiness. And I have to decide whether this report, surrounding circumstances, show a particularized guarantee of trustworthiness. The Court finds it does. It's a neutral fact witness who was doing a medical examination. If I'm wrong, I'm wrong. But it seems to me that if ever there was neutral situation, this is it. And, the Court's going to admit State's Exhibit 42 [autopsy report] over the objection of the defendant. Now, with State's Exhibit 42 admitted, the Court sees no reason it can't be the basis of [an opinion by] another pathologist."

In his brief on appeal, the defendant argued that Dr. Eckert's autopsy report was inadmissible hearsay under the Confrontation Clause because no showing was made regarding Dr. Eckert's reliability and the report was thus improperly used by Dr. Mitchell to form the basis for his expert opinion testimony. The defendant relied in part upon the analysis set forth in *Roberts*, 448 U.S. 56, in arguing that the State failed to prove that the autopsy report prepared by Dr. Eckert carried a particularized guarantee of trustworthiness.

However, defense counsel subsequently filed Supreme Court Rule 6.09(b) (2004 Kan. Ct. R. Annot. 42), a letter informing this court that he intended to argue that Dr. Eckert's statements in the autopsy report were inadmissible under *Crawford*, 541 U.S. 36, because they were testimonial and the defense had no opportunity for cross-examination. Resolution of this issue involves multiple layers of analysis, including whether the autopsy report falls under a hearsay exception, whether it was testimonial under *Crawford*, and whether it could be used by the State's expert.

## Hearsay

"An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Carter*, 278 Kan. 74, Syl. ¶ 1, 91 P.3d 1162 (2004).

No question exists in this case that the autopsy report is relevant. Relevancy established, an appellate court reviews the district court's decision to admit or exclude hearsay evidence under the abuse of discretion standard of review. *State v. Flynn*, 274 Kan. 473, 507, 55 P.3d 324 (2002).

The parties seem to agree that the autopsy report was hearsay, but they differ on the hearsay exception under which the autopsy report should be analyzed. The defendant's analysis focuses on K.S.A. 2004 Supp. 60-460(d)(3), while the State focuses on K.S.A. 2004 Supp. 60-460(o). Although both exceptions were discussed before the district court, it appears the evidence was admitted under 60-460(d)(3). Under this exception, the district court must find:

" '(1) the declarant is unavailable as a witness, (2) the matter described was recently perceived by the declarant and made while memory was fresh, and (3) the statement was made under circumstances so as to show that is was in good faith, before there was any action pending, and with no incentive to falsify or distort.' " *State v. Broyles*, 272 Kan. 823, 839, 36 P.3d 259 (2001) (quoting Barbara, Kansas Rules of Evidence with Evidence Objections and Evidentiary Foundations § 7.6 [3d ed.1993]).

We conclude that the autopsy report would fall under K.S.A. 2004 Supp. 60-460(d)(3). Dr. Eckert's death rendered him unavailable at trial. The autopsy was performed on December 20, 1982, and the description portion of the autopsy report Dr. Eckert prepared was dated December 21, 1982, the day after the autopsy was performed. The autopsy report was prepared as part of his duties as a pathologist, prior to any pending litigation. No evidence was presented that Dr. Eckert had any reason to falsify or distort his routine medical observations of the body. Although the autopsy report would qualify under this subsection, this issue is subject to the Confrontation Clause analysis as further discussed hereafter.

Additionally, the State argues that the autopsy report qualified as an official document exception to hearsay under K.S.A. 2004 Supp. 60-460(o), which provides:

"(o) *Content of official record.* Subject to K.S.A. 60-461 and amendments thereto, (1) if meeting the requirements of authentication under K.S.A. 60-465 and amendments thereto, to prove the content of the record, a writing purporting to be a copy of an official record or of an entry therein or (2) to prove the absence of a record in a specified office, a writing made by the official custodian of the official records of the office, reciting diligent search and failure to find such record."

K.S.A. 2004 Supp. 60-465 provides in relevant part:

"A writing purporting to be a copy of an official record or of an entry therein, meets the requirements of authentication if the judge finds that the writing purports to be published by authority of the nation, state or subdivision thereof, in which the record is kept or evidence has been introduced sufficient to warrant a finding that the writing is a correct copy of the record or entry."

The State relies upon *State v. Bell*, 239 Kan. 229, 232-33, 718 P.2d 628 (1986), in which this court found that a coroner's report is required to be filed with the clerk of the district court in the county where the death occurs under K.S.A. 19-1032 (Ensley 1981) (now K.S.A. 2004 Supp. 22a-232) and becomes an official public document admissible under the exception in K.S.A. 60-460(o). See also *State v. Hobbs*, 276 Kan. 44, 52-53, 71 P.3d 1140 (2003) (error in excluding coroner's report as evidence during the testimony of deputy coroner that had performed the autopsy but had not authored the report of death where no question regarding trustworthiness was raised; report spoke for itself, was relevant and was admissible under 60-460[o]). In contrast, the defendant cites *State v. Johnson*, 220 Kan. 720, 725, 556 P.2d 168 (1976) (directing trial court to excise hearsay information contained within five-page coroner's report).

The assumption at trial and on appeal was that the autopsy report was not required to be filed with the district court. However, both parties fail to recognize a critical statute in effect at the time of the murder which required the autopsy report to be filed with the clerk of the district court as well. K.S.A. 19-1033 (Ensley 1981) provides that if the coroner requests an autopsy: "A full record and report

of the facts developed by the autopsy and findings of a person making such autopsy shall be promptly made and filed with the coroner and with the clerk of the district court of the county in which the decedent died."

Since a copy of the autopsy report was required to be filed with the clerk of the district court as well as the coroner's report, it follows that the autopsy report would also qualify as a copy of an official record under K.S.A. 2004 Supp. 60-460(o). Dr. Clark testified that a copy of the autopsy report was attached to the coroner's report that he filed with the clerk of the district court. The autopsy report was stamped: "TRUE & ACCURATE COPIES OF RE-CORDS RETAINED AT THE SALINA POLICE DEPT." The defendant did not challenge that the autopsy report was not authentic; rather, he challenged the inherent reliability of Dr. Eckert's statements within the report. Thus, we conclude that the autopsy report was admissible under both hearsay exceptions, subject to a Confrontation Clause analysis.

### Confrontation Clause

The defendant argues that even though the autopsy report may have been admissible as a business or official record exception to hearsay, Dr. Eckert's statements in the autopsy report were inadmissible under K.S.A. 60-456 and *Crawford* because they were testimonial and the defendant had no opportunity for cross-examination. As Dr. Eckert was never subject to cross-examination by the defense, the key determination under the Confrontation Clause analysis in this case is whether Dr. Eckert's autopsy report was testimonial evidence under *Crawford*. As previously noted, the United States Supreme Court has provided the following guidance in that regard:

"Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation omitted]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation omitted]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that

the statement would be available for use at a later trial,' [citation omitted]. These formulations all share a common nucleus and then define the [Confrontation] Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition . . . .

"Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." 541 U.S. at 51-52.

The determination of whether an autopsy report is testimonial is an issue of first impression in Kansas. The defendant cites several cases from other jurisdictions which do not involve autopsy or coroner's reports in arguing that the court should evaluate the admission of a report of an unavailable coroner under *Crawford* depending on the reasonable expectation of how that report will be used. In these cases, the courts distinguish between reports compiled as ordinary business records (nontestimonial) and those prepared with the reasonable expectation of use in a subsequent prosecution (testimonial). See *In re T. T.*, 351 Ill. App. 3d 976, 992-95, 815 N.E.2d 789 (2004) (Child victim's hearsay statements to the doctor describing the cause of symptoms or pain or the general character of a sexual assault were not testimonial, but her statement identifying the respondent as the perpetrator was testimonial.); *City of Las Vegas v. Walsh*, 91 P.3d 591, 593-96, *modified* 100 P.3d 658 (Nev. 2004) (Nurse's affidavit regarding the conditions under which she drew blood from the defendant for testing related to driving under the influence was testimonial because it was prepared solely for the prosecution's use at trial.); *People v. Hernandez*, 7 Misc. 3d 568, 569-70, 794 N.Y.S.2d 788 (2005) (Latent fingerprint report not requested by prosecution and made before defendant's identity was known was testimonial because the fingerprints were not simply taken for administrative use but "were taken with the ultimate goal of apprehending and successfully prosecuting a defendant."); *People v. Rogers*, 8 App. Div. 3d 888, 891-92, 780 N.Y.S.2d 393 (2004) (Blood alcohol report generated by a private lab generally relied upon by the state police was testimonial "[b]ecause the test was initiated by the prosecution and generated by the desire to discover evidence against defendant, the results were testimonial, and the defendants had the right to cross-examination regarding the authenticity of the sample and the testing

methodology."); *State v. Powers*, 124 Wash. App. 92, 101-02, 99 P.3d 1262 (2004) (911 call reporting violation of a no-contact domestic violence order was testimonial because it was not part of the criminal incident itself or a request for help but instead was a report of the violation of the protective order and a description to assist in apprehension and prosecution.).

However, other jurisdictions have admitted similar evidence without making this distinction. *Rios v. Lansing*, 2004 WL 2750261 (10th Cir. 2004) (unpublished opinion filed December 2, 2004) (Civilian social worker's report required to be produced pursuant to internal rules and regulations for defendant's daughter/victim's juvenile dependency case was nontestimonial—Tenth Circuit Court of Appeals did not distinguish between types of statements within the report.); *State v. Dedman*, 136 N.M. 561, 569-72, 102 P.3d 628 (2004) (Blood alcohol report, while prepared in anticipation of trial, was nontestimonial because it was routine, nonadversarial and made to ensure accurate measurement.); *People v. Moscat*, 3 Misc. 3d 739, 745, 777 N.Y.S.2d 875 (2004) (911 call for help was not testimonial: "A testimonial statement is produced when the government summons a citizen to be a witness; in a 911 call, it is the citizen who summons the government to his or her aid.").

The defendant argues the court should analyze autopsy or coroner's reports by examining the reasonable expectation of how the reports will be used. He argues that under Kansas statutes a coroner is notified of a death under the following circumstances which may all lead to potential litigation:

"When any person dies, or human body is found dead in the state, and the death is suspected to have been the result of violence, caused by unlawful means or by suicide, or by casualty, or suddenly when the decedent was in apparent health, or when decedent was not regularly attended by a licensed physician, or in any suspicious or unusual manner, or when in police custody, or when in a jail or correctional institution, or in any circumstances specified under K.S.A. 22a-242, and amendments thereto, or when the determination of the cause of a death is held to be in the public interest . . . . The coroner in the county of the cause of death shall decide if an investigation shall take place. . . . Investigation may include, but is not limited to, obtaining medical and law enforcement background

information, examination of the scene of the cause of death, inquest, autopsy, and other duties required of the coroner." K.S.A. 2004 Supp. 22a-231.

Under K.S.A. 2004 Supp. 22a-232, the coroner must make inquiries regarding the cause of death if the case falls under K.S.A. 2004 Supp. 22a-231 and reduce the findings to a written report. The defendant argues that a coroner does not have to perform an autopsy in all cases; however, those that are performed can be said to have been prepared with the reasonable expectation of litigation in mind. The defendant seeks to distinguish cases where only ordinary litigation is expected, *i.e.*, probate or insurance claims, by arguing those autopsy reports are nontestimonial in nature. Where autopsy reports are prepared in cases of homicide, the defendant contends the expectation of a criminal prosecution is clearly in mind and therefore the reports are testimonial. However, none of the cases which have addressed autopsy reports under *Crawford* have adopted this point of view.

In *Smith v. State*, 898 So. 2d 907 (Ala. Crim. App. 2004), the Alabama Court of Criminal Appeals considered whether a defendant's confrontation rights were violated when autopsy evidence and a report were admitted without the testimony of the medical examiner who performed the autopsy. The court found that this evidence was not testimonial under *Crawford*. 898 So. 2d at 916. However, the court went on to find that although the autopsy report was admissible under the business records exception, under the particular facts of the case, the defendant's confrontation rights were violated because the cause of death was a crucial element of the charge against the defendant and the prosecution was permitted to prove an essential element without providing the defendant with an opportunity to cross-examine the pathologist who originally determined the cause of death was asphyxiation, but the court found this violation to be harmless error. 898 So. 2d at 916-18. See also *State v. Perkins*, 897 So. 2d 457, 462-65 (Ala. Crim. App. 2004) (autopsy report was nontestimonial under *Crawford*).

In *Moreno Denoso v. State*, 156 S.W.3d 166, 180-82 (Tex. App. 2005), *rev. denied* September 14, 2005, after concluding that the certified autopsy report was admissible under the public records

exception, the court considered whether the report was admissible under the Confrontation Clause because, as in this case, the report's author had died prior to trial. Contrary to our defendant's assertions in his Supreme Court Rule 6.09 letter of authority, the Texas Court of Appeals did not simply hold that autopsy reports are business records which are not subject to *Crawford*. Rather, the court cited several Texas cases which had found various statements either testimonial or nontestimonial before concluding that the autopsy report did not fall under any of the categories of testimonial evidence described in *Crawford*: it was not prior testimony at a preliminary hearing, before a grand jury, or at a former trial; nor was it a statement given in response to police interrogations. The court held that the admission of the nontestimonial autopsy report without the deceased pathologist's testimony was not a violation of the Confrontation Clause. 156 S.W.3d at 181-82.

In *People v. Durio*, 7 Misc. 3d 729, 734-36, 794 N.Y.S.2d 863 (2005), the Kings County New York Supreme Court found that an autopsy report prepared by the Office of the Chief Medical Examiner (OCME), a nonlaw enforcement agency designated by statute to investigate unnatural deaths, which was later used in a murder case without the testimony of the medical examiner who performed the autopsy, was not testimonial and thus its admission as a business record did not violate the Confrontation Clause. The court reasoned in part:

"The autopsy report in this case was not manufactured for the benefit of the prosecution. Indeed, an autopsy is often conducted before a suspect is identified or even before a homicide is suspected. That it may be presented as evidence in a homicide trial does not mean that it was composed for that accusatory purpose or that its use by a prosecutor is the inevitable consequence of its composition. The mandate of OCME is clear, to provide an impartial determination of the cause of death. [Citation omitted.]

"Finally, courts cannot ignore the practical implications that would follow from treating autopsy reports as inadmissible testimonial hearsay in a homicide case. Years may pass between the performance of the autopsy and the apprehension of the perpetrator. This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. Unlike other forensic tests, an autopsy cannot

be replicated by another pathologist. Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case." 7 Misc. 3d at 736.

In *Rollins v. State*, 161 Md. App. 34, 866 A.2d 926 (2005), the Maryland Court of Special Appeals considered a factually similar case where the district court admitted an autopsy report prepared by a doctor who did not testify at trial and permitted another doctor to review the report and render an expert opinion concerning the cause of death. On appeal, the court first found that the opinions and conclusions in the autopsy report fell squarely within the business records exception (and the public records exception) of the hearsay rule and was thus "technically" nontestimonial hearsay. However, recognizing that *Crawford* affords the States flexibility in their treatment of nontestimonial hearsay, the court found that this allows a certain degree of discretion to the States where the right to confrontation is deemed to be violated by receipt of nontestimonial hearsay covered by a firmly rooted exception to the hearsay rule. 161 Md. App. at 75.

The court resolved this issue by differentiating between objective factual findings (nontestimonial) and opinions and conclusions regarding cause of death (testimonial) contained in the report:

"[T]he findings in the autopsy report of the physical condition of a decedent, which are routine, descriptive and not analytical, which are objectively ascertained and generally reliable and enjoy a generic indicum of reliability, may be received into evidence without the testimony of the [medical] examiner. Where, however, contested conclusions or opinions in an autopsy report are central to the determination of *corpus delicti* or criminal agency and are offered into evidence, they serve the same function as testimony and trigger the Sixth Amendment right of confrontation." 161 Md. App. at 82.

The court recognized that the *"inclusion within a factual report of inadmissible evaluations or opinions need not necessarily result in exclusion of the entire report"* if those portions were redacted. 161 Md. App. at 74. Under the facts in *Rollins*, the court found that the admission of the autopsy report was not a denial of the right of confrontation because the trial judge had redacted those portions of the report that constituted opinions or conclusions, including references to the cause and manner of death (asphyxiation) and

characterizations as to smothering, homicide, and disease. 161 Md. App. 77-81.

Thus, all of the cases which specifically address autopsy reports: *Smith, Moreno Denoso, Durio,* and *Rollins* have found that autopsy reports are generally nontestimonial under *Crawford.* We believe the reason why these cases have not adopted the arguments and reasoning set forth by the defendant is that it would have the effect of requiring the pathologist who performed the autopsy to testify in every criminal proceeding. If, as in this case, the medical examiner is deceased or otherwise unavailable, the State would be precluded from using the autopsy report in presenting its case, which could preclude the prosecution of a homicide case. We view this as a harsh and unnecessary result in light of the fact that autopsy reports generally make routine and descriptive observations of the physical body in an environment where the medical examiner would have little incentive to fabricate the results. See *Moreno Denoso,* 156 S.W.3d at 180. ("Even though autopsy reports are partially subjective, they are generally prepared by officials with no motive to fabricate the results of the reports, and as a general rule, a medical examiner's office is not such a uniquely litigious and prosecution-oriented environment as to create an adversarial context.").

We conclude that the approach set forth by the Maryland Court of Special Appeals provides the best balance between concerns that a examiner performing the autopsy is expressing opinions regarding causes of death or other disputed conclusions which have not been subjected to cross-examination and concerns that no autopsy reports would ever be admissible without the testimony of their authors. Under such an approach, factual, routine, descriptive, and nonanalytical findings made in an autopsy report are nontestimonial and may be admitted without the testimony of the medical examiner. In contrast, contested opinions, speculations, and conclusions drawn from the objective findings in the report are testimonial and are subject to the Sixth Amendment right of cross-examination set forth in *Crawford.* Such testimonial opinions and conclusions should be redacted in the event that the medical examiner is unavailable. No denial of due process arises under this

resolution because both parties are granted access to the objective findings of the autopsy report and both parties may proceed to obtain their own expert testimony, opinions, and conclusions based upon the objective findings of the medical examiner performing the autopsy.

Under the facts of this case, the cause of death was not a disputed fact; rather, the defense was concerned with how long the victim had been deceased. Although the autopsy report classified the offense as a homicide and listed the final anatomic diagnoses of pulmonary edema and congestion, it did not opine as to how long the victim had been deceased. The State's expert, Dr. Mitchell, opined that the time of death was consistent with the State's theory, relying on the autopsy report, photographs, the death certificate, and a toxicology report.

Although Dr. Eckert's opinions regarding cause of death were included in the autopsy report, this evidence was cumulative. Dr. Clark, the coroner, personally observed the victim's body and opined that the cause of death was strangulation and suffocation and that S.B. had been dead 6 to 8 days. As this opinion testimony had already been established by evidence other than the autopsy report, any error in the admission of Dr. Eckert's statements as to the cause of death was harmless. See *State v. Sims*, 256 Kan. 533, 546, 887 P.2d 72 (1994) (doctor's expert testimony based upon a different doctor's report not admitted into evidence not error where bulk of testimony and conclusions based on evidence already presented by the defendant's expert witnesses and by the defendant in open court).

## Expert Testimony

K.S.A. 60-456(b) provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The defendant does not dispute that Dr. Mitchell possessed the requisite special knowledge, skill, experience, or training to testify

as an expert witness. Rather, the defendant takes issue with Dr. Mitchell's opinion as to the time of death based upon facts or data which were not perceived or personally known to him. As Dr. Mitchell did not personally observe the crime scene or the autopsy, the information in the autopsy report was "facts or data . . . made known" to him at trial. "Knowledge made known to the witness refers to facts [admitted into] evidence." *Sims*, 256 Kan. at 546.

As discussed above, the objective findings of the autopsy report were properly admitted into evidence. Additionally, Dr. Mitchell based his opinions and conclusions upon photographs, a toxicology report, and the death certificate which was prepared by the coroner who provided corroborating testimony at trial. *Cf. Sims*, 256 Kan. at 546. The district court did not abuse its discretion by admitting Dr. Mitchell's expert testimony because it was based on facts or data made known to him at trial. The defendant's argument fails.

c. Denial of Defense Request for a Continuance

Charges were filed against the defendant on December 6, 2001. On November 19, 2002, the first day of trial, the defendant moved for a continuance because he was unable to locate a witness, Joanne Hersfeld. The defense proffered that Hersfeld, a close friend of S.B., had called and spoken with S.B. on December 13, 1982, a few days after the defendant left Kansas. Hersfeld could also testify that Czarnowski's demeanor at the funeral was inappropriate for someone who had just suffered such a personal loss. The State opposed the continuance, arguing that Hersfeld was not "real firm" that she had talked to the victim on that date and that the call did not appear on Hersfeld's phone records.

The defense responded that Hersfeld would explain that her check with the telephone company revealed the possibility it was having computer billing problems at that point in time. Defense counsel told the district court that Hersfeld had been interviewed by law enforcement officers in Ellsworth in March 2001. The defense sent an investigator to Ellsworth at that time but was unsuccessful in locating her. Based on different leads, the defense had unsuccessfully searched for Hersfeld in Wichita, Kansas; Oregon; and Wyoming. The defense suspected that she was living with her

brother-in-law in Castle Rock, Colorado, and had identified two individuals with matching names, but it had yet to make contact because the individuals did not have telephone service.

The district court denied the motion reasoning that the defense seemed to be saying it might be impossible to find the witness, that the defense knew about the witness for some time and had months to prepare for trial, and that some witnesses may have disappeared based on the age of the crimes. The district judge concluded, "Nothing I can do. I'm sorry it happened. Wish you had her here, but there's nothing the Court can do. You've had months to look for her, she's just not available."

The defendant argues the district court violated his right to present a complete defense by denying his motion for a continuance. Under the state and federal constitutions, a defendant is entitled to present the theory of his or her defense and the exclusion of evidence that is an integral part of that theory violates a defendant's fundamental right to a fair trial. However, the right to present a defense is subject to statutory rules and case law interpretations of the rules of evidence and procedure. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003).

K.S.A. 22-3401 provides that "[c]ontinuances may be granted to either party for good cause shown."

"In a criminal case, the granting or denial of a continuance rests in the sound discretion of the trial court. The ruling of the trial court will not be disturbed on appeal absent a showing of an abuse of discretion and a showing of prejudice to the substantial rights of the defendant. Discretion is abused only where no reasonable person would take the view adopted by the trial court." *State v. Snodgrass*, 252 Kan. 253, Syl. ¶ 5, 843 P.2d 720 (1992).

The defendant relies primarily upon the following two cases in support of his argument. In *Winkelman v. Allen*, 214 Kan. 22, 519 P.2d 1377 (1974), an action by a real estate broker to recover a commission, the district court refused to grant a 1-day continuance when weather conditions prevented an expert witness from being present. The witness had not been subpoenaed because he was not a hostile witness. This court agreed that expert testimony regarding standards of the real estate industry concerning a "qualified buyer"

was crucial and the denial of the continuance was prejudicial. 214 Kan. at 34.

In *State v. Jones*, 226 Kan. 503, 601 P.2d 1135 (1979), the identity of the defendant as one of the perpetrators of the robbery was a principal issue. An eyewitness who would testify that the robber had a noticeable goatee and no firearm failed to show up at trial. Defense counsel twice attempted to subpoena the witness through the sheriff, personally served a third subpoena on the witness, spoke with the witness and his family about his appearance and testimony, spent the noon recess searching for the witness, and requested a continuance until the next morning and a bench warrant so that the sheriff could find and bring the witness to the court. The district court mistakenly ruled that it did not have jurisdiction to issue the warrant. On appeal, this court found that defense counsel was diligent in seeking to obtain the witness' testimony. We concluded that the witness' testimony was crucial to the defense, since the defendant had presented evidence that the defendant was clean shaven at the time of the robbery, and the failure to grant a continuance was an abuse of discretion and prejudicial error. 226 Kan. at 509-10.

This case is distinguishable from *Jones* and *Winkelman*, where defense counsel had been in contact with the witnesses and were only requesting 1-day continuances. In contrast, defense counsel in this case had unsuccessfully attempted to locate the absent witness in several different states over a 20-month period and could not assure the court that the witness would ever be found. This case is more analogous to a case only incidentally cited by the defendant, *State v. Howard*, 221 Kan. 51, 55, 557 P.2d 1280 (1976).

In *Howard*, the defendant issued two subpoenas for an alibi witness, but the sheriff was unable to find the witness. A typographical error was subsequently found in the address of the subpoena. A message was left with a family member, but the witness failed to appear at trial. The court granted a half-day continuance but denied the defendant's request for a 2-week continuance. No showing was made of what the witness would say, "nor was there any indication that the witness could be reasonably expected to appear if a continuance was granted." 221 Kan. at 54. In finding

the district court did not abuse its discretion in denying the 2-week continuance, this court set forth the following test to be used when a continuance is requested to secure the attendance of a witness:

"When a continuance is requested during the trial of a case [to secure attendance of a witness], the trial judge must weigh the many factors involved—possible prejudice to the defendant, the diligence (or lack of it) disclosed in attempting to secure the attendance of the witness, the materiality and importance of the probable testimony, and the probability of the witness' appearance at a later date if the continuance is granted." *Howard*, 221 Kan. at 55.

Application of the *Howard* factors to this case supports the district court's decision. The proffered testimony that S.B.'s boyfriend was acting inappropriately at the funeral was not particularly relevant and would not establish, as the defendant suggests, that the boyfriend killed S.B. out of jealousy over the defendant. In contrast, the proffered testimony that the witness spoke with S.B. 2 days after when the State suggested S.B. had been murdered was material and important to refute the time of death. However, the State's argument that the witness was not firm on what date she spoke with S.B. and that the call did not appear in the witness' telephone phone records were also important factors to be considered.

The defense was essentially asking for an indefinite continuance the day of trial in this 20-year-old murder case. Two of the State's witnesses had already died before trial. Several months had elapsed since the trial setting, and the defendant's search for the absent witness had proved unsuccessful. The defendant's inability to secure an out-of-state subpoena without a location suggested that the witness did not want to and probably would not be found. After weighing the *Howard* factors, it cannot be said that no reasonable person would have denied the motion for continuance. The district court did not err in denying a continuance and did not prejudice the defendant's right to a fair trial.

d. Exclusion of Evidence Concerning Defense Theory of Consent

Prior to trial, the defense moved to admit evidence of prior sexual conduct of S.B. pursuant to K.S.A. 21-3525(b). At the in camera

hearing, the defense sought to introduce evidence that (1) at the time of S.B.'s death, she was involved in a nonmonogamous sexual relationship with Czarnowski that included unprotected sexual intercourse and possibly anal intercourse on December 9, 1982, and (2) two of S.B.'s former neighbors would testify that S.B. was willing to engage in spontaneous, voluntary sexual relations with other men. The defense argued this evidence was relevant to the defendant's theory of consent and to explain the postmortem observations for S.B. The autopsy report indicated no signs of injury to S.B.'s vagina, anus, or the inner aspects of her legs.

The district court granted the motion regarding S.B.'s sexual relationship with Czarnowski around the time of the murder. However, the court refused to admit evidence regarding the defendant's second request, reasoning that statements made by S.B.'s neighbors at a former residence 6 months to 1 year prior to the murder were not relevant.

The defendant argues that the district court erred by excluding such evidence. A district court's decision to exclude evidence under the rape shield statute is subject to an abuse of discretion standard. However, the defendant is also claiming that he was denied his constitutional right to present a complete defense. When an appellate court is reviewing a constitutional challenge to the admission or exclusion of evidence, the appellate court applies the federal constitutional rule. Under that rule, an error may not be held to be harmless unless the appellate court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. See *State v. Atkinson*, 276 Kan. 920, 925, 80 P.3d 1143 (2003).

The Kansas rape shield statute, K.S.A. 21-3525, provides that in a prosecution for rape:

"(b) . . .evidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible, and no reference shall be made thereto in the presence of the jury, except under the following conditions: The defendant shall make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. . . . The court shall conduct a hearing on the motion in camera. At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the previous sexual conduct of the complaining witness

is relevant and is not otherwise inadmissible as evidence, the court may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted. The defendant may then offer evidence and question witnesses in accordance with the order of the court."

"Under K.S.A. 21-3525, a rape victim's prior sexual activity is generally inadmissible since prior sexual activity, even with the accused, does not of itself imply consent to the act complained of. The rape shield statute does allow evidence of a victim's prior sexual conduct if it is proved relevant to any fact at issue." *Atkinson*, 276 Kan. 920, Syl. ¶ 2.

The rape shield statute does allow evidence of a victim's prior sexual conduct if it is proved relevant to any fact at issue, such as the identity of the rapist, the consent of the victim, or whether the defendant actually had intercourse with the victim. See 276 Kan. at 926. Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b).

The defendant argues the proffered evidence that the victim was prone to spontaneous sexual relationships with men was relevant because it contradicted the State's theory that the motive for the rape and murder was the victim's refusal to engage in a sexual relationship with the defendant and supported his defense of consent. He contends the policies of the rape shield statute would still be met through introduction of such evidence in this case. The defendant relies primarily upon the following two cases in support of his position.

In *Atkinson*, this court found the trial court violated the Confrontation Clause by excluding evidence that Atkinson and the victim had sexual intercourse the night before the alleged rape because it was highly relevant to explaining why Atkinson's DNA matched the sperm found during the rape examination. 276 Kan. at 928-29.

In *State v. Perez*, 26 Kan. App. 2d 777, 780-83, 995 P.2d 372 (1999), *rev. denied* 269 Kan. 939 (2000), the Court of Appeals found the trial court erred in excluding evidence of the complaining witness' sexual activities with two other men during the evening of the alleged rape pursuant to the rape shield statute. Applying the following relevancy factors, the court found that based on the proximity in time between the encounters, the distinctive pattern of the sexual behavior, and the lack of physical evidence connecting

the defendant with the rape, the prior sexual conduct was relevant to credibility and consent. 26 Kan. App. 2d at 781-83. The *Perez* court stated:

"In a prosecution for sex offenses, when addressing whether prior sexual conduct of a complaining witness is relevant to the issues of consent and credibility, factors to be considered include: (1) whether there was prior sexual conduct by complainant with defendant; (2) whether the prior sexual conduct rebuts medical evidence on proof of origin of semen, venereal disease, or pregnancy; (3) whether distinctive sexual patterns so closely resembled defendant's version of the alleged encounter so as to tend to prove consent or to diminish complainant's credibility on the questioned occasion; (4) whether prior sexual conduct by complainant with others, known to the defendant, tends to prove he or she believed the complainant was consenting to his or her sexual advances; (5) whether sexual conduct tends to prove complainant's motive to fabricate the charge; (6) whether evidence tends to rebut proof by the prosecution regarding the complainant's past sexual conduct; (7) whether evidence of sexual conduct is offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the acts charged; and (8) whether the prior sexual conduct and the charged act of the defendant are proximate in time." 26 Kan. App. 2d 777, Syl. ¶ 3.

Application of these factors distinguishes this case from both *Atkinson* and *Perez*. None of the factors were met in this case. No evidence was presented that the victim had engaged in prior sexual conduct with the defendant, nor was any factual similarity established between the instant case and the victim's alleged prior sexual conduct of being prone to having spontaneous, voluntary sexual relations with men. The victim's alleged prior sexual conduct and the defendant's charged act were not proximate in time, as those allegations were made by previous neighbors of the victim some 6 months to 1 year prior to the incident in this case. *Cf. State v. Montes*, 28 Kan. App. 2d 768, 774, 21 P.3d 592, *rev. denied* 271 Kan. 1040 (2001) (proximity factor not satisfied when prior conduct was 1-2 months earlier). Furthermore, physical evidence was presented in this case connecting the defendant to the victim.

The inability of the defendant to establish any of the above factors reveals his purpose in seeking to admit such evidence. The defendant sought to establish that S.B. had a propensity to engage in consensual sex with the defendant based on her alleged prior behavior, despite evidence that she had previously rejected his sex-

ual advances. This is the type of situation that the Kansas rape shield statute was designed to prevent:

"'The Kansas [rape shield] statute merely serves to focus both judges' and attorneys' attention upon the fact that the victim's prior sexual activity is not generally relevant, reminding them that *a victim's lack of chastity has no bearing whatsoever on her truthfulness and generally has no bearing on the important issue of consent.*'" (Emphasis added.) *Atkinson,* 276 Kan. at 926 (quoting *In re Nichols,* 2 Kan. App. 2d 431, 433-34, 580 P.2d 1370, *rev. denied* 255 Kan. 844 [1978]).

Although the victim's death negated some of the policy concerns of the rape shield statute, its application was still important to prevent the jury from using irrelevant evidence of alleged sexual conduct in assessing whether the victim consented to the charged act. See also *State v. Gonzales,* 245 Kan. 691, 699-700, 783 P.2d 1239 (1989) (trial court properly excluded evidence under the rape shield statute that victim had a "propensity to establish her social acquaintances with males on a spontaneous basis" in a felony-murder and attempted rape prosecution).

We conclude that the district court did not abuse its discretion by excluding this evidence under the rape shield statute. Moreover, even if we were to conclude that the exclusion of this evidence was error, it is highly unlikely that this testimony would have had any effect on the outcome of the trial in light of the substantial evidence placing the defendant at the scene of the crimes, the DNA evidence establishing that the defendant's semen was found in S.B., and the defendant's abrupt unexpected departure from the Mission on the alleged night of the crimes.

### e. Admission of Pre-*Miranda* Statements

The defendant filed a pretrial motion seeking to suppress statements he made to Agent Hagen while in custody. The district court denied his motion, and the defendant's statements were admitted at trial. He claims that the district court erred.

"An appellate court reviews the district court's decision regarding the suppression of a confession using a dual standard. The factual findings are reviewed using a substantial competent evidence standard. An appellate court will not reweigh the evidence and will give deference to the trial court's factual findings. The ultimate legal conclusion drawn from the trial court's factual findings is a question

of law which is reviewed de novo. *State v. White*, 275 Kan. 580, 596-97, 67 P.3d 138 (2003). An appellate court accepts as true the evidence and all inferences drawn therefrom that support the trial court's findings." *State v. Combs*, 280 Kan. 45, 118, P.3d 1259 (2005).

Agent Hagen testified that he and Detective Forrester traveled to Sumpter County, Alabama, to interview the defendant regarding the 1982 murder of S.B. and to determine whether he was the same individual who had an outstanding warrant out for his arrest. The Sumpter County Sheriff was asked to bring the defendant in for questioning. During this process, the sheriff drew a weapon on the defendant, told him he was under arrest, and transported him to the sheriff's department.

The defendant was placed in an office with Hagen and Forrester at the Sumpter County Jail. The defendant asked why they were there. Hagen responded by identifying himself, saying that he was from Kansas, and indicating that they were investigating a case in Kansas regarding an individual who was using his social security number. The defendant responded, "I've never been to Kansas." Hagen informed him that they needed to read him his *Miranda* rights, they read through the *Miranda* waiver, and the defendant initialed each section and indicated he understood.

Before signing the document, the defendant asked again why the officers were there. Hagen told him that an individual named S.B. was found dead in Salina, Kansas, and that someone named Robert Moore, who was using the defendant's social security number, had some connection with the case. The defendant said he did not know S.B., he did not know Robert Moore, and that he might have been in Wichita in 1969 or 1970 working as a cook after he got out of the Marines. Hagen asked the defendant if he would like to sign the waiver of rights form, and the defendant asked to talk with his girlfriend. After talking to his girlfriend, the defendant declined to sign the waiver and said he needed an attorney.

At that point, Hagen told the defendant that they had an arrest warrant for him and that Hagen had a photograph of the defendant from the relevant time period. He showed the defendant the photograph, said that the defendant was going to be maintained in Alabama, and asked the defendant if he wanted to be transported

back to Kansas. The defendant said he was not making any statements until he talked to his attorney, and the conversation ended.

In its findings and conclusions, the district court held that the defendant's statements were voluntary, spontaneous statements not elicited by an interrogation and the comments and actions of the officers did not amount to the functional equivalent of an interrogation. The court reasoned that Hagen had briefly explained why he was there in direct response to the defendant's question and it was the defendant who contemporaneously blurted out his statements in an apparent attempt to exculpate himself.

The defendant argues the district court violated his Fifth and Fourteenth Amendment rights under the United States Constitution and § 10 of the Kansas Constitution Bill of Rights by admitting his pre-*Miranda* inculpatory statements because they were elicited by the functional equivalent of a custodial interrogation.

"The Fifth Amendment to the United States Constitution states that no person shall be compelled in any criminal case to be a witness against himself or herself, nor be deprived of life, liberty, or property without due process of law. [Citation omitted.] *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), holds that the State may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. [Citation omitted.]

"*Miranda* warnings come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. [Citation omitted.] An objective standard is used to judge whether an interrogation was custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation." [Citation omitted.] *State v. Hebert*, 277 Kan. 61, 68, 82 P.3d 470 (2004).

No dispute exists that the defendant was in custody at the time he made the statements. Thus, our analysis focuses on whether the agent's actions constituted an interrogation.

" ' "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safe-

guards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." ' *Dudley*, 264 Kan. at 643 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 [1980])." *Hebert*, 277 Kan. at 69.

" 'It is well established that volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by the *Miranda* holding. [Citations omitted.] Moreover, an accused's statement may be found to be voluntary and spontaneous and, thus, admissible even though it is made after the accused is arrested and in custody.' " [Citations omitted.] *State v. Richardson*, 256 Kan. 69, 86, 883 P.2d 1107 (1994) (quoting *State v. Mooney*, 10 Kan. App. 2d 477, 480, 702 P.2d 328, *rev. denied* 238 Kan. 879 [1985]).

The defendant contends that Hagen's statements "were not routine booking questions" but were designed to elicit incriminating responses. He contends the first deceptive statement—that they were talking to him because someone named Robert Moore was using his social security number in Kansas—was designed to see if the defendant would admit that he was in fact the same person as Robert Moore. He further contends that a reasonable person would feel that Hagen was expecting a response from his second statement that Robert Moore had been involved in a homicide in Kansas.

The defendant relies primarily upon *Hebert*, in which this court found that the following comments made by a KBI agent prior to administering *Miranda* warnings constituted an interrogation:

" 'Talk to you a little bit and get both sides of the story. I've only heard one side of the story and, obviously, there's always two sides of a story here and I'd like in your words, your input and tell me what happened and explain in your words and coming from you. Would you like the opportunity to tell me your side of the story?' " 277 Kan. at 67.

In *Hebert*, although the agent claimed that he was shocked that the defendant responded with an incriminating statement, this court clarified that it was not concerned with the agent's subjective feelings but whether the officer should have known the words were reasonably likely to elicit an incriminating response. We reasoned that the officer should have known that the defendant, who had

made no previous statement, who knew he had shot the officer, and who had been in custody for several hours, might be anxious to take him up on the request for his version of the events. We concluded that this was not a routine booking question but rather was designed to gain information from the defendant about the shooting. 277 Kan. at 70.

Likewise, in *State v. Ninci*, 262 Kan. 21, 936 P.2d 1364 (1997), during the first hour of the interview, the officers asked Ninci if he recognized a picture of the prime murder suspect and why his car was seen at the victim's house the same week as the murder. We held that the officers should have known these questions were reasonably likely to elicit an incriminating response from Ninci and thus had been subjected to an interrogation. 262 Kan. at 36.

In contrast, we found no interrogation had occurred in the following cases. In *State v. Payne*, 273 Kan. 466, 44 P.3d 419 (2002), Payne asked why he was being taken into custody prior to being *Mirandized*, and the officer responded that it was due to a suspicious death. The officer asked Payne who owned the car he was removed from and Payne said it belonged to Eddie Harris. The officer asked how long Payne had possessed the car and he responded for about 3 days. Without being told that Harris was the murder victim, Payne asked, " 'So Eddie Harris is dead?' " 273 Kan. at 468. The officer responded that Payne needed to talk to the detectives about that. This court concluded that Payne's statements were not the result of interrogation and were made voluntarily. 273 Kan. at 479.

In *State v. Ferguson*, 254 Kan. 62, 864 P.2d 693 (1993), prior to administering *Miranda* rights, the officer introduced himself to Ferguson and asked her if she needed a drink of water, if she needed to use the restroom, and if she needed any medical assistance. She responded in the negative and then asked the officer " 'if [the victim] was dead.' " The officer responded, " 'Yes, and' " Ferguson said, " 'Didn't mean to kill him,' " " 'Didn't want to,' " and " 'I'm tired of this,' " or " 'I'm tired of it.' " 254 Kan. at 64, 84-85. This court concluded that Ferguson's various statements were not the result of interrogation and appeared to be more voluntary than involuntary and more spontaneous than not. 254 Kan. at 85.

In *State v. Jones*, 222 Kan. 56, 563 P.2d 1021 (1977), Jones and Miller were placed in a line-up after they were arrested. After the line-up, Jones initiated an exchange with a police officer by asking if either he or Miller had been identified. When the officer answered, " 'Yes,' " Jones stated, " 'Miller wasn't with me on the robbery.' " 222 Kan. at 60. This court upheld the district court's admission of the statement on the ground that there was substantial competent evidence that "[t]he statement was not the product of an interrogation, but resulted from a conversation initiated by defendant." 222 Kan. at 60.

This case is distinguishable from the exchanges found to be interrogations in *Hebert* and *Ninci* and is more analogous with those in *Payne, Ferguson,* and *Jones*. The agent in this case did not ask the defendant any questions. The defendant initiated the statements by repeatedly asking why the officers were there. The agent's statements to the defendant were in direct response to questions initiated by the defendant, and they were simply a description of the officers' investigation. As noted by the district court, it was the defendant who voluntarily and spontaneously blurted out his statements in an apparent attempt to exculpate himself.

Although the defendant characterizes the agent's first statement as deceptive, it was a true statement demonstrating how the events had progressed which led the law enforcement officers to Alabama. The agent did not initially say he was investigating a homicide case because that has a tendency to shock people. The agent's explanations of why they had contacted the defendant were not reasonably likely to elicit an incriminating response from the suspect.

We conclude that the factual findings of the district court are supported by substantial competent evidence and support its legal conclusion regarding admissibility. We hold that the district court properly admitted the defendant's pre-*Miranda* statements into evidence.

### f. Testimony Concerning S.B.'s Mother's Absence at Trial

Sandy Van Fleet testified that her sister, the victim, would generally call home about two or three times a week, that the last time

she called home was on December 10, 1982, and that their mother had tried to call S.B. several times over the next week but did not get a response. Van Fleet's testimony about what her mother said regarding the failed attempts was not permitted based upon hearsay grounds. The following relevant exchange then occurred:

"Q. [Prosecutor:] The best of your knowledge, did anyone in your family ever see her or speak with her after December 10, 1982?
"A. [Witness Van Fleet:] No.
"Q. And, is your mother still living?
"A. Yes.
"Q. Is she here at this trial?
"A. No.
"Q. Why? Why isn't she?
  "[Defense:] I'm going to object to relevance, Your Honor.
  "[Counsel:] Overruled.
"Q. [Prosecutor:] Why isn't she here?
"A. [Witness:] Due to physical and mental. She couldn't handle it."

The defendant argues this line of questioning had nothing to do with the issues of whether the defendant had consensual sex with or killed the victim. Rather, he contends this testimony was introduced solely to inflame the passions of the jury and prejudiced his right to a fair trial.

According to K.S.A. 60-407(f), all relevant evidence is admissible, except as otherwise provided. See K.S.A. 60-401(b); *State v. Groschang*, 272 Kan. 652, 667, 36 P.3d 231 (2001). "The determination of relevancy is a matter of logic and experience, not a matter of law. Nevertheless, there must be some material or logical connection between collateral facts and the inference or result they are supposed to establish for them to be competent." *State v. Pennington*, 276 Kan. 841, 847, 80 P.3d 44 (2003).

Once relevancy is established,

"[t]he admission and exclusion of evidence lies within the sound discretion of the trial court. Appellate courts review the trial court's admission of evidence for abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, or in other words, when no reasonable person would have taken the position that was taken by the trial court." *Hebert*, 277 Kan. 61, Syl. ¶ 9.

The defendant relies primarily upon *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998). In that case, the primary issue was

whether the defendant killed a police officer with premeditation. At trial, the victim's widow was permitted to testify in detail about the victim's personality and accomplishments and his relationship with her, other family members, and friends. The testimony spanned 28 pages of the transcript. The prosecutor referred to this testimony at length during opening and closing arguments. We found the testimony was "irrelevant, prejudicial, and inflammatory," was not relevant to any material fact charged, and was intended to improperly influence the jury and prejudice the defendant's right to a fair trial. 265 Kan. at 84-85.

The *Donesay* court applied a dual test in determining whether the admission of such testimony was harmless:

"First, we must determine if the admission of the evidence was inconsistent with substantial justice, *i.e.*, whether substantial rights of defendant were affected by the admission of [the widow's] testimony. Second, if not, can we declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial?" 265 Kan. at 88.

The court concluded that the testimony affected the defendant's right to a fair and impartial trial and reversed the convictions. 265 Kan. at 88-89.

Van Fleet's testimony in this case is clearly distinguishable from the extensive prejudicial testimony in *Donesay*. It consisted of one short statement explaining that S.B.'s mother was not at the trial because she could not physically and mentally handle being there. The prosecutor asked no follow-up questions, and Van Fleet did not elaborate on her statement. Evidence regarding the last time S.B.'s mother talked to the victim alive was relevant to establishing the time frame for the murder. Since S.B.'s sister rather than her mother was testifying, the question (and answer) was a logical follow-up as to why S.B.'s mother was not testifying about the telephone calls in light of the hearsay objection. The district court did not abuse its discretion in admitting this evidence.

Moreover, even if we were to find that the testimony was erroneously admitted, it cannot be said that the defendant's substantial rights were affected or that the error had any likelihood of changing the result of the trial. The defendant suggests that Van Fleet's testimony was of such an inflammatory nature that it contributed

to the convictions. See *State v. Eaton*, 244 Kan. 370, 385-86, 769 P.2d 1157 (1989), *overruled in part on other grounds State v. Chisholm*, 250 Kan. 153, Syl. ¶ 4, 825 P.2d 147 (1992). He reasons that because Van Fleet's testimony did not contradict his theory of events, *i.e.*, that he had consensual sex with S.B. and S.B. was alive when he left town, it was likely that the jury was irreparably prejudiced against him by virtue of its verdicts.

The defendant's argument is without merit. It is unlikely that the one sentence response during a 3-day trial affected the substantial rights of the defendant. The defendant admits that the statement did not refute his theory of defense, and the statement had no connection to any material facts of the case. The fact that the jury did not believe the defendant's version of events is more readily attributable to the DNA evidence recovered from S.B.'s body and his abrupt departure than to this solitary statement regarding the absence of S.B.'s mother. As the defendant's substantial rights were not violated and no reasonable likelihood exists that the outcome of the trial would have been different, we conclude that any error in the admission of the statement was harmless.

### g. Cumulative Trial Error

"Cumulative trial errors may require reversal of a defendant's conviction if the totality of the circumstances shows they substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." *Hebert*, 277 Kan. 61, Syl. ¶ 13.

The defendant argues that cumulative trial errors substantially prejudiced his right to a fair trial. As discussed above, the only clear trial error was the district court's admission of the deceased cab driver's description of the fare he picked up on the alleged night of the incident and possibly the victim's sister's solitary statement as to why their mother was not at trial. In light of the overwhelming DNA evidence, testimony placing the defendant at the scene of the crimes, and the defendant's unexpected departure the alleged night of the incident, the defendant was not substantially prejudiced by these trial errors.

h. Failure to Prove Prior Convictions Under the Habitual Criminal Act

At sentencing, the State submitted certified copies of a journal entry from a North Carolina case where "Robert H. Lackey, Jr." pled guilty to the felony crime of assault with intent to commit rape in November 1970 and a journal entry from a Florida case where "Robert H. Lackey, Jr." pled guilty to assault with intent to commit sexual battery in February 1977. The Florida journal entry contained fingerprints; however, no evidence was presented that the fingerprints matched those of the defendant. The defense objected to the admission of the journal entries on the grounds that they failed to meet the proper form and failed to identify that the person named in the journal entries was in fact the defendant. The court asked if the defendant was contesting that he was the same person named in the journal entries and defense counsel responded, "He is."

Regarding identity, the State responded that the defense did not give any notice that it intended to object to identity during the presentence investigation and cited *State v. Baker*, 237 Kan. 54-55, 697 P.2d 1267 (1985), for the proposition that a properly authenticated journal entry of prior conviction for a person with the same name is sufficient. The district court overruled the objections and admitted the journal entries. The defendant's rape conviction carried a minimum term of 5 to 15 years and a maximum prison term of 20 years to life. K.S.A. 21-3502(2) (Ensley 1981); K.S.A. 1982 Supp. 21-4501(b). Utilizing the prior convictions, the court tripled the defendant's minimum sentence from 15 to 45 years, giving him an enhanced sentence of 45 years to life as a habitual criminal under K.S.A. 1982 Supp. 21-4504(b).

On appeal, the defendant argues the district court erred by invoking the HCA to triple his sentence for rape when the State failed to prove that he was the same person who received the prior convictions. "Whether a criminal sentence is illegal is a question of law, and an appellate court has unlimited review of questions of law." *State v. Walker*, 277 Kan. 849, Syl. ¶ 1, 89 P.3d 920 (2004).

"It is a fundamental rule that a person convicted of a crime is given the sentence in effect when the crime was committed, including any applicable Habitual Crim-

inal Act penalties." *Walker*, 277 Kan. 849, Syl. ¶ 2. K.S.A. 1982 Supp. 21-4504 provided in relevant part:

"(b) If a defendant is convicted of a felony a third or subsequent time, the trial judge shall sentence the defendant as follows, upon motion of the prosecuting attorney:

(1) The court shall fix a minimum sentence of not less than the greatest nor more than three times the greatest minimum sentence authorized by K.S.A. 21-4501 and amendments thereto, for the crime for which the defendant is convicted; and

(2) the court may fix a maximum sentence of not less than the least nor more than three times the greatest maximum sentence provided by K.S.A. 21-4501 and amendments thereto, for the crime.

. . . .

"(e) A judgment may be rendered pursuant to this section only after the court finds from competent evidence the fact of former convictions for felony committed by the prisoner, in or out of the state."

The defendant argues the State failed to meet its burden of producing competent evidence of the contested prior convictions under the HCA. He relies on cases in which the appellate courts disapproved of proof of prior convictions under the HCA by Federal Bureau of Investigation and Kansas Bureau of Investigation "rap sheets" and a statement made to a court services officer. See *Tuscano v. State*, 206 Kan. 260, 264-67, 478 P.2d 213 (1970); *State v. Taylor*, 198 Kan. 290, 299-300, 424 P.2d 612 (1967); *State v. Hicks*, 11 Kan. App. 2d 76, 86-88, 714 P.2d 105 (1986). However, those cases are distinguishable from the present case in which certified copies of the two journal entries were submitted to the court.

The issue boils down to whether the defendant's name on the journal entries was sufficient to prove identity when he contested the fact that he was the same person named in the journal entries without providing any supporting evidence. "It is a well-established rule that identity of name is prima facie evidence of identity of person, and it devolves upon those who deny the identity to overcome the presumption by proof." *Bayha v. Mumford*, 58 Kan. 445, 446, 49 Pac. 601 (1897). "Generally, proof of prior felony convictions to invoke the Habitual Criminal Act [K.S.A. 21-4504] is made by using certified or authenticated copies of journal entries of convictions from other states or counties. This is the best possible evidence of a prior felony conviction . . . ." *State v. Maggard*, 16

Kan. App. 2d 743, 753, 829 P.2d 591, *rev. denied* 251 Kan. 941 (1992).

"*Absent a denial of identity or rebuttal evidence,* proof beyond the identity of the name in the document is not required for admission of the evidence. *State v. Cippola,* 202 Kan. 624, 629, 451 P.2d 199, *cert. denied* 396 U.S. 967 (1969)." (Emphasis added.) *State v. Greever,* 19 Kan. App. 2d 893, 900, 878 P.2d 838 (1994). However, the *Cippola* court went on to state that the better practice dictates that where the question of the identity of the defendant on trial is raised with respect to prior convictions of similar offenses under K.S.A. 60-455, the State should offer evidence showing that the defendant is the same person who was previously convicted. 202 Kan. at 629-30.

The State's reliance upon *Baker* at the trial court level for the proposition that certified copies of prior convictions are sufficient to prove a defendant's prior convictions was misplaced, as we limited its holding to situations where a defendant does not contest identity:

"While defendant objected to the evidence introduced by the State on technical grounds, he did not then contend that he is not the same person named in the Shawnee County journal entry by which the State introduced competent evidence of a prior felony conviction of the accused; he did not dispute or refute the evidence. We conclude that the trial court did not err in finding that the defendant had a prior felony conviction." *Baker,* 237 Kan. at 55.

Likewise, the State's reliance upon *Greever,* presents a similar problem. In *Greever,* the defendant argued the journal entries of conviction alone were not sufficient evidence to prove that Greever had committed the prior crimes where he did not concede the issue of identity. The court noted that Greever did not deny he was the same person named in the journal entries, that his attorney noted that Greever had committed the offenses, and that his attorney only argued that the State had not proved that he was the same defendant as listed in the journal entries. The Court of Appeals concluded that "[g]iven the similarity in names, the admissions by Greever's counsel, the lack of denial of identity, and the failure to provide any rebuttal evidence as to identity, admission of these

journal entries as evidence of prior convictions was not an abuse of judicial discretion." 19 Kan. App. 2d at 901.

In *State v. Maggard*, 24 Kan. App. 2d 868, 877-79, 953 P.3d 1379, *rev. denied* 264 Kan. 823 (1998) (*Maggard II*), on subsequent appeal, the Court of Appeals relied upon *Greever* in finding certified and authenticated copies of complaints and journal entries were sufficient to prove criminal history under the HCA where defense counsel merely asserted evidence was insufficient to establish identity rather than denying identity; presented no rebuttal evidence to overcome the presumption of similar names in the journal entries; and corroborating evidence existed in the presentence report. *Baker, Greever,* and *Maggard II* are thus all distinguishable from this case where the defendant specifically denied being the same person identified in the journal entries of the prior convictions.

While not directly on point, *State v. Staven*, 19 Kan. App. 2d 916, 881 P.2d 573 (1994), provides better guidance on this issue. In *Staven*, the Court of Appeals found that the Kansas Sentencing Guidelines Act (KSGA), see K.S.A. 21-4724(c)(4), requires the State to prove prior convictions by at least as much as was required to be proven under the HCA; "[a] certified or attested copy of a journal entry of conviction is sufficient proof of a prior offense *unless the defendant denies he or she is the same person named in the prior felony journal entry.*" (Emphasis added.) 19 Kan. App. 2d at 918. Although the State had proven the prior convictions by certified journal entries, the court found that Staven's counsel had raised the issue of identity with respect to the prior convictions by stating: " 'I think there's certainly a question as to whether we're talking about the same person.' " 19 Kan. App. 2d at 919. See also *State v. Presha*, 27 Kan. App. 2d 645, 646-47, 8 P.3d 14, *rev. denied* 269 Kan. 939 (2000) ("Generally, prior felony convictions to invoke the HCA are proven by certified or authenticated copies of the journal entries of conviction. . . . However, *if the defendant disputes identity, the State may have to produce additional evidence.*" [Emphasis added.]); *State v. Hankins*, 19 Kan. App. 2d 1036, 1049, 880 P.2d 271 (1994) ("Under the Habitual Criminal Act, a certified or attested copy of a journal entry of conviction constituted suffi-

cient proof of a prior offense *in the event a defendant did not deny identity.*" [Emphasis added.]).

The State acknowledges that defense counsel briefly stated the defendant was contesting identity but argues that the two certified journal entries were sufficient competent evidence to prove the prior convictions because the defendant offered no rebuttal evidence. This argument fails for three reasons.

First, our previously discussed case law provides that certified journal entries are sufficient to prove prior convictions absent a denial of identity or rebuttal evidence. Our use of the term "or" rather than "and" demonstrates that the defendant need not do both in order to require the State to provide more evidence. Second, the State is seeking to shift the burden of proof to the defendant when "[d]ue process requires that the State prove the existence of prior convictions in every essential particular, unless admitted by the defendant, before the prior convictions can be used to enhance the sentence." *State v. Jones,* 272 Kan. 674, 677, 35 P.3d 887 (2001). Finally, as in *Staven,* while concisely stated, defense counsel indicated that the defendant was contesting that he was the same person named in the journal entries. The *Staven* court found defense counsel's brief statement about identity with no mention of rebuttal evidence sufficient to contest identity.

In this case, the defendant contested that he was the same person named in the out-of-state journal entries, but the State presented no corroborating evidence to support its contention. Although the Florida journal entry contained identifying fingerprints, the State did not present testimony that the fingerprints contained in the documents matched the defendant in this case. The defendant did not have the burden to put forth rebuttal evidence regarding his challenge to identity. As such, competent evidence did not support a finding that the defendant had prior convictions to enhance his sentence under the HCA. The defendant's sentence is vacated, and the case is remanded for resentencing.

### i. Constitutionality of HCA after *Apprendi*

The defendant argues his constitutional rights were violated at sentencing when the court tripled his sentence pursuant to the

HCA based on his prior convictions which were not included in the complaint, presented to the jury, or proven beyond a reasonable doubt based on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

The constitutionality of the HCA involves a question of law over which this court has unlimited review. *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2001). In *Ivory*, this court found that *Apprendi* does not apply where the sentence imposed was based in part on the defendant's criminal history score under the KSGA:

"The KSGA builds criminal history into the calculation of a presumptive sentence, rather than using criminal history as an enhancement. The determination of a felony sentence is based on two factors: the current crime of conviction and the offender's prior criminal history. The sentence contained in the grid box at the juncture of the severity level of the crime of conviction and the offender's criminal history category is the presumed sentence. [Citations omitted.]

"In *Apprendi*, the United States Supreme Court said: '*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.' 530 U.S. at 490. The prior conviction exception was derived from the holding 2 years earlier in *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998). There, the court concluded that the fact of a prior conviction is a sentencing factor and not an element of the crime. Thus, the prior conviction need not be presented in the indictment and proven to a jury in order to be used by the court to increase the sentence imposed. 523 U.S. at 226-27." *Ivory*, 273 Kan. at 46.

As the defendant does in this case, Ivory argued that *Apprendi* raised serious doubts about the constitutionality of *Almendarez-Torres*, and we cited several cases from other jurisdictions which held that *Apprendi* did not overrule *Almendarez-Torres. Ivory*, 273 Kan. at 46-47. Relevant to this case, we cited the following from *United States v. Paycheck-Zepeda*, 234 F.3d 411, 414-15 (9th Cir. 2001):

" 'Although *Apprendi* does refer to the fact that the defendant in *Almendarez-Torres* did not challenge the accuracy of his prior convictions, nowhere does *Apprendi* limit *Almendarez-Torres* to cases where a defendant admits prior aggravated felony convictions on the record. [Citation omitted.] To the contrary, *Apprendi* held that all prior convictions—*not just those admitted on the record*—were exempt from *Apprendi's* general rule and, under *Almendarez-Torres*, may

continue to be treated as sentencing factors.' " (Emphasis added.) *Ivory*, 273 Kan. at 47.

The defendant distinguishes the KSGA from the HCA where the indeterminate sentencing provisions did not require criminal history to be taken into account at sentencing but were only considered upon motion of the prosecuting attorney. See K.S.A. 1982 Supp. 21-4501; K.S.A. 1982 Supp. 21-4504. He argues criminal history is not mechanically applied to compute an offender's sentence under the HCA but is used to enhance the maximum sentence under indeterminate sentencing. He argues that the United States Supreme Court would now decide *Almendarez-Torres* differently based on *Apprendi*. However, the defendant's argument fails in light of the following recent cases.

In *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), the United States Supreme Court held that the state trial court's sentencing of the defendant to more than 3 years above the 53-month statutory maximum of the standard range for his offense, on the basis of the sentencing judge's finding that the defendant acted with deliberate cruelty, violated his Sixth Amendment right to a trial by jury. In so finding, the majority identified its analysis as an application of the *Apprendi* rule: "Other than the fact of a prior conviction . . . " and concluded that the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 542 U.S. at 301-03.

In *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005), the Court applied the principles of *Apprendi* and *Blakely* to the mandatory provisions of the federal sentencing guidelines and found them unconstitutional as far as they required judges to find facts by a preponderance of the evidence for the imposition of aggravated sentences. To remedy the constitutional infirmity created by applying judge-found facts to the guidelines, the Court severed the provision of the federal sentencing statute that made application of the guidelines mandatory. However, the Court specifically reaffirmed its holding in *Apprendi*: "Any fact (*other than a prior conviction*) which is necessary to support a

sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." (Emphasis added.) 543 U.S. at 244.

In *Shepard v. United States*, 544 U.S. 13, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005), the Supreme Court held that a trial court may not look to police reports or complaint applications of a prior plea to determine if the prior conviction constituted a violent felony so as to be used to enhance a sentence under the Armed Career Criminal Act, see 18 U.S.C. § 924 (2000), but it may examine the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented. The Court reasoned in part that while the disputed fact may be described as a fact about a prior conviction, "it is far too removed from the conclusive significance of a prior judicial record, and too much like the findings subject to *Jones* and *Apprendi*, to say that *Almendarez-Torres* clearly authorizes a judge to resolve the dispute." 544 U.S. at 25.

In a concurring opinion, Justice Thomas opined: "*Almendarez-Torres*, like *Taylor*, has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided. [Citations omitted.] The parties do not request it here, but in an appropriate case, this Court should consider *Almendarez-Torres* continuing viability." 544 U.S. at 27-28 (Thomas, J., concurring).

Since *Blakely, Booker,* and *Shephard* were decided, the Tenth Circuit Court of Appeals has repeatedly rejected arguments such as those raised by the defendant in this case questioning whether a prior conviction may continue to be a judicially recognized fact under *Almendarez-Torres*. See *United States v. Williams,* 403 F.3d 1188, 1198 (10th Cir. 2005) (for purposes of sentencing under the Armed Career Criminal Act provisions of § 924, the government need not charge the fact of a prior conviction in an indictment and submit it to a jury after *Booker, Blakely, & Shephard*); *United States v. Gonzalez-Huerta,* 403 F.3d 727, 731 n.1 (10th Cir. 2005) ("[T]he holding in *Booker* envisions *Almendarez-Torres* as good

law . . . . We believe that any reconsideration of *Almendarez-Torres* must be conducted by the Supreme Court."); *United States v. Moore*, 401 F.3d 1220, 1224 (10th Cir. 2005) ("Although the Court may overrule *Almendarez-Torres* at some point in the future, it has not done so, we will not presume to do so for the Court, and we are bound by existing precedent to hold that the *Almendarez-Torres* exception to the rule announced in *Apprendi* and extended to the [federal] Guidelines in *Booker* remains good law."); see also *United States v. Aguirre-Leon*, 2005 WL 806700, *3 n.1 (D. Kan. 2005) (unpublished opinion filed April 7, 2005) (applying *Moore* in holding *Almendarez-Torres* remains good law after *Booker*); *Lopez v. People*, 113 P.3d 713, 723 (Colo. 2005) ("Although there is some doubt about the continued vitality of the prior conviction exception, we conclude that it remains valid after *Blakely*.").

Regardless of whether the prior convictions are built into the criminal history score under the KSGA or used on motion of the prosecutor under the HCA, the prior convictions enhance the defendant's sentence beyond what he would have received in the absence of those prior convictions. *Booker, Blakely, Apprendi, Williams, Gonzalez-Huerta, Moore, Aguirre-Leon, Lopez,* and *Ivory,* all provide the fact of a prior conviction does not have to be submitted to a jury to be proved beyond a reasonable doubt. The HCA scheme requires that the district court find competent evidence of the prior convictions, and due process requires the State to prove the existence of the prior convictions in every essential particular, unless admitted by the defendant, before the prior convictions can be used to enhance a sentence. *Jones,* 272 Kan. at 677. The fact that the State did not have to prove the prior convictions beyond a reasonable doubt does not make the use of the prior convictions violative of due process. Where substantial competent evidence does not establish the prior convictions, as discussed above, the district court is without authority to use them at sentencing under the HCA.

As stated in by this court in *Ivory*: "Counsel has not cited a case nor has our research discovered one extending *Apprendi* to hold that increasing a sentence based on the fact of prior convictions is

unconstitutional." 273 Kan. at 47. The use of prior convictions under the HCA is not unconstitutional under *Apprendi*.

Convictions affirmed, sentence vacated, and case remanded for resentencing.

GERNON, J., not participating.

LARSON, S.J., assigned.