NOT DESIGNATED FOR PUBLICATION

No. 115,218

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

DAKOTA R. JOY,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed March 10, 2017. Reversed and remanded.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Sam S. Kepfield*, of Hutchinson, for appellee.

Before HILL, P.J., BUSER and LEBEN, JJ.

BUSER, J.: This is an interlocutory appeal by the State of Kansas. The State appeals the district court's order suppressing incriminating statements made by Dakota R. Joy during on-scene questioning by police and later while being transported to jail after his arrest. For the reasons discussed in this opinion, we hold that contrary to the district court's ruling, Joy's statements were not made in violation of the Fifth Amendment to the United States Constitution as interpreted by *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Accordingly, the district court's order suppressing the incriminating statements is reversed and the case is remanded for further proceedings.

1

FACTUAL AND PROCEDURAL BACKGROUND

At about 8 a.m. on August 21, 2015, Jessica Kelly, a law enforcement officer with the Hutchinson Police Department, responded to a disturbance call involving a man with a knife. A neighbor who reported the disturbance to the police claimed she saw the man in jeans and a red shirt approaching the residence of Zane Mountain with a knife in his hand.

Officer Kelly was the first officer on the scene. Upon her arrival, two men later identified as Joy and his friend, Jared, began walking from the front yard of Mountain's residence toward Officer Kelly's vehicle. Officer Kelly's dashboard video camera recorded her initial encounter with Joy, her on-scene questioning of him, and Joy's subsequent arrest. Additionally, there was an audio recording which memorialized Officer Kelly's conversations with Joy at the scene and while he was transported to the jail. These recordings were reviewed and considered by the district court prior to making its suppression ruling.

At the scene, Joy wore a maroon T-shirt with jeans and had a large sheathed knife attached to his belt. Joy had his hands in his pockets. Officer Kelly displayed a firearm as she exited her police vehicle and commanded Joy and Jared to stop their approach. Both men complied. Officer Kelly then ordered Joy to take his hands out of his pockets, remove the knife from his belt, "lift up [his] shirt so that [she] could make sure [he] didn't have any other knives," turn around, and walk slowly backwards toward her. Joy promptly obeyed and walked backwards toward the officer. Kelly holstered her gun. About this time, two other officers arrived at the scene and began standing near Jared and Mountain who were separated from each other.

As Officer Kelly and Joy were standing, facing each other in front of Kelly's vehicle, the officer did not pat down, frisk, or touch him. Joy began the conversation by

2

excitedly asking if he was in trouble. Officer Kelly replied that he was not, but Joy interrupted her by stating that the owner of the house, Mountain, had Joy's belongings and would not give them back to him. Officer Kelly clarified that the police "got a call that there was a burglary going on and that you were taking stuff you weren't supposed to and that you had a large knife on you, so I just—." Once again, Joy interjected, "No, No," and then he began explaining his version of the events.

Without any questioning by Officer Kelly, Joy explained that he and his companion, Jared, were attempting to move to Illinois with Mountain's former girlfriend, Bailey, and they planned to leave that day. Mountain, however, would not let his former girlfriend leave his house. Joy stated, "I came up to [Mountain's] window and he was like, 'you need to get the [expletive] off my property.'" Additionally, Joy was upset because two of his notebooks were in Mountain's residence and Mountain had refused to return them.

Officer Kelly took notes during Joy's interview and eventually asked several follow-up questions such as: "Did you used to live here—stay here—or what?" Other questions Officer Kelly asked of Joy focused on gathering the identities, backgrounds, and recent residences of the other people at the scene. Those questions that directly related to Joy dealt with his background information, including height, weight, current address, phone number, birthdate, and why Joy did not have a photo I.D. Kelly advised the dispatcher of this identification information. Officer Kelly later testified that during this time she detained Joy but she was not interrogating him about any crime and she did not read him his *Miranda* rights.

While Officer Kelly questioned Joy, two other officers individually questioned Jared and Mountain. A 17-year old woman, Bailey, moved about the front yard carrying her infant. Officer Kelly left Joy, walked over to one of the officers, and they privately exchanged information about their interviews with the witnesses at the scene. At this

3

point, Kelly received a radio communication from the dispatcher, whereupon she walked over to Joy and said, "You've got a warrant, man." Joy was immediately arrested. The arrest occurred about 9 minutes after Officer Kelly's arrival at the scene. The officer placed Joy in handcuffs, emptied his pockets, told him what he could and could not possess in jail, and finally placed him in the back of her patrol vehicle.

For the next hour, the officers at the scene continued their investigation into possible criminal conduct by Joy, Mountain, and the welfare of Bailey's infant who was staying at the residence. The officers eventually arrested Mountain for criminal restraint, criminal damage to property, and domestic violence. The infant was removed from the residence and placed in protective custody. During this time, Officer Kelly occasionally checked on Joy to make sure he was comfortable in the police vehicle, but she did not question him.

Officer Kelly transported Joy to the local jail. During the drive, Joy inquired about posting bail on the arrest warrant. Officer Kelly responded by advising Joy there was an additional charge. When Joy asked what the charge was, Officer Kelly stated it was for aggravated assault and briefly described the available evidence. Joy responded by admitting to having a knife during his encounter with Mountain but then continued his discussion with Officer Kelly on the topic of bail.

Joy was charged with aggravated assault in violation of K.S.A. 2016 Supp. 21-5412(b)(1). Prior to trial, Joy filed a motion to suppress his incriminating statements. Joy contended that he was in custody from the moment Officer Kelly arrived at the scene and drew her weapon and, as a result, any incriminating statements he made after that time were inadmissible because Officer Kelly failed to advise him of his *Miranda* rights.

On January 22, 2016, the district court held a hearing on Joy's suppression motion. Officer Kelly was the only witness to testify. Officer Kelly testified that she initially

4

detained Joy because she "didn't know what was going on" and "didn't know if [Joy] was for sure the suspect." According to the officer, she did not interrogate Joy at any time about threatening Mountain with a knife. On cross-examination, Officer Kelly indicated that prior to his arrest Joy was not "free to go." The officer clarified that she arrested Joy because he had an outstanding warrant, not because of the alleged aggravated assault upon Mountain.

At the hearing, Joy's attorney asked the district court to suppress all statements Joy made prior to the time he was advised of his *Miranda* rights. Of note, nowhere in the record is there evidence that Joy received *Miranda* warnings at any time. Joy's attorney asserted that Joy was in custody for *Miranda* purposes when Officer Kelly initially confronted him with her gun drawn and ordered him to turn around and walk backwards towards her.

The district court took the motion to suppress under advisement in order to review the video and audio recordings. Subsequently, the district court granted Joy's motion to suppress. The district judge reasoned:

> "[I]t was apparent that Mr. Joy was the focus of the officer's attention immediately upon arrival. I think he became a suspect at that time, and when I say immediate, it's, when the officer approached she saw that Mr. Joy had a knife on his person and she instructed him to put your hands up, take the knife off, and back toward me, which Mr. Joy did. . . . Essentially Mr. Joy remained in the officer's custody until he was transported. He was not handcuffed immediately; he eventually was. But I believe he would have discerned that he was not free to leave and was under the officer's control from the moment that he was told to back up toward the officer."

Relying on *State v. Deal*, 271 Kan. 483, 23 P.3d 840 (2001), the district court concluded that under the circumstances Joy was "deprived of his freedom of action" before he began answering Officer Kelly's questions. As a result, the district court ruled

that Joy should have been advised of his *Miranda* rights, and this omission required suppression of the resulting incriminating responses.

The State filed this interlocutory appeal.

ON-SCENE QUESTIONING

On appeal, the State contends:

"[T]he Defendant was initially questioned for the sole purpose of investigating what had happened and why the police had been dispatched to the residence. He was not under arrest and not subjected to custodial interrogation requiring the administration and waiver of his constitutional rights under the *Miranda* decision. . . . In the present case, informing [Joy] why the police were called to the scene, and informing him why he was being arrested for aggravated assault, were not the functional equivalent of interrogation designed to elicit an incriminating response."

For his part, the defendant responds:

"Joy was not free to leave the scene from the instant that Officer Kelly arrived. Her actions, drawing her weapon and ordering Joy to lift his shirt for weapons, to walk backward, added to the totality of the circumstances that signaled to Joy that he was in custody and could not leave. [Officer] Kelly's failure to read Joy his Miranda rights renders his statements inadmissible."

In reviewing a district court's ruling on a motion to suppress incriminating statements, appellate courts employ a dual standard of review. In particular:

"In reviewing a district court's decision regarding suppression of evidence, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard

6

with independent judgment. An appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence." *State v. Vanek*, 39 Kan. App. 2d 529, Syl. ¶ 1, 180 P.3d 1087 (2008).

In the present appeal, the material facts are not disputed. The essential question for our decision is whether the district court erred in concluding as a matter of law that these facts constituted substantial competent evidence that Officer Kelly engaged in a custodial interrogation of Joy without advising him of his *Miranda* rights and obtaining a waiver of those rights.

Under the Fifth Amendment to the United States Constitution, the State may not use statements made by a defendant during a custodial interrogation unless the State provided procedural safeguards to preserve the defendant's privilege against self-incrimination. *Miranda*, 384 U.S. at 444. The *Miranda* safeguards

> "are triggered only when an accused is (a) in custody and (b) subject to interrogation. Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom in any significant way. A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage." *State v. Lewis*, 299 Kan. 828, Syl. ¶ 1, 326 P.3d 387 (2014).

The United States Supreme Court in *Miranda* emphasized that these constitutional protections applied only to custodial interrogations, not to "general on-the-scene police questioning of a suspect in the fact-finding process." *Vanek*, 39 Kan. App. 2d at 532. In particular, the Supreme Court noted:

> "Our decision is not intended to hamper the traditional function of police officers in investigating crime. [Citation omitted.] . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding

7

process is not affected by our holding. . . . In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." *Miranda*, 384 U.S. at 477-78.

In making the determination of whether questioning is investigatory or custodial, an objective standard is used. *State v. Jacques*, 270 Kan. 173, 186, 14 P.3d 409 (2000). "The proper analysis is how a reasonable person in the suspect's position would have understood the situation." 270 Kan. 173, Syl. ¶ 6.

Our Supreme Court has identified eight factors for courts to consider in determining whether police questioning of an individual is investigative or custodial. These factors include:

"(a) the interrogation's time and place; (b) its duration; (c) the number of law enforcement officers present; (d) the conduct of the officer and the person questioned; (e) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (f) whether the person is being questioned as a suspect or a witness; (g) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (h) the interrogation's result, *e.g.*, whether the person was allowed to leave, was detained further, or was arrested after the interrogation." *Lewis*, 299 Kan. 828, Syl. ¶ 2.

Both the State and Joy agree that this eight-factor test is the appropriate standard by which to evaluate whether Officer Kelly's on-scene questioning was investigatory or custodial. We will independently review the circumstances of the officer's questioning considering these eight factors.

*The Time and Place of the Interrogation*

Officer Kelly's questioning of Joy occurred in the morning on a residential street in front of Mountain's residence while the officer and Joy were standing in front of the officer's patrol vehicle.

*The Duration of the Interrogation*

Officer Kelly questioned Joy for about 9 minutes before she arrested him on the outstanding warrant. Upon his arrest, Officer Kelly and Joy exchanged small talk about the subject matter of the warrant and what personal items Joy would be able to bring into the jail. Joy was frisked, handcuffed, and placed in the officer's patrol vehicle. While Officer Kelly continued her investigation by interviewing other individuals at the scene and inspecting Mountain's residence, she occasionally returned to her vehicle and spoke to Joy to make sure he was alright.

*The Number of Police Officers Present*

Officer Kelly was the first law enforcement officer to arrive at the scene. She was the only officer to speak with Joy prior to his arrest. Two other officers joined Officer Kelly at the scene, and they were separately positioned next to Jared and Mountain a short distance away, standing in the driveway, street, or front yard of Mountain's residence.

*The Conduct of the Officer and the Person Questioned*

Upon her arrival at the scene, Officer Kelly drew her handgun and ordered Joy and Jared to remove their hands from their pockets and stop walking towards her. Joy was instructed to remove the knife from his belt and pull up his shirt in order that Officer Kelly could see that he didn't have any other knives. Joy promptly complied. In keeping

9

with Officer Kelly's instructions, Joy then walked backwards to her location. Officer Kelly holstered her weapon. Shortly thereafter, Joy asked if he could rebuckle his belt and Officer Kelly agreed to his request. Officer Kelly did not pat down, frisk, or touch Joy during the time period from the initial encounter until his arrest.

Joy initiated the conversation with Officer Kelly by asking if he was in trouble. Kelly replied that he was not, but Joy promptly interrupted her by stating that the owner of the house, Mountain, had Joy's belongings "and he won't let me get [them]." Joy asked the officer to let him get his stuff from Mountain. In response, Officer Kelly stated that she was there because the police "got a call that there was a burglary going on and that you were taking stuff you weren't supposed to and that you had a large knife on you, so I just, that's my safety [*sic*]." Joy interjected, "No. No," and then volunteered his version of the incident involving Mountain.

As detailed earlier, without any questioning by Officer Kelly, Joy spontaneously explained his version of the incident involving Mountain. During Joy's explanation, he never stated that he had a knife or that he had threatened Mountain in any way. Joy did relate a prior incident, however, where Mountain threatened to shoot Jared and beat up Joy.

Officer Kelly took notes during Joy's interview and eventually asked several follow-up questions. The questions Officer Kelly asked of Joy focused on gathering the identities, backgrounds, relationships, and recent residences of Jared, Mountain, Bailey, and her infant. Questions that directly related to Joy only dealt with his background information, including height, weight, current address, phone number, birthdate, employment, and why Joy did not have a photo I.D. Kelly advised the dispatcher of Joy's identification information.

10

While waiting for a response from the dispatcher, Officer Kelly told Joy, "[H]ang tight right here for a minute." Officer Kelly walked over to another officer standing in the vicinity, and the two officers discussed the information each had obtained during their investigation. In particular, the officer related that Mountain claimed that Joy had come up to the window of his house and threatened him with a knife. Within a minute of receiving this information, Officer Kelly learned from the dispatcher that Joy had an active arrest warrant. She promptly walked back over to Joy and told him he was under arrest because of the outstanding warrant. Joy was cooperative and complied with all of Officer Kelly's requests during his arrest.

A review of the recordings shows that Officer Kelly's demeanor was polite, informal and, at times, almost friendly. She did not threaten or cajole Joy in order to obtain answers to her questions. On the contrary, she demonstrated an understanding and low-key personality and attempted to answer Joy's questions and address his concerns. Indeed, even after she arrested Joy, Officer Kelly told another officer searching Mountain's residence to recover Joy's notebooks in the home in order to return them to him.

While Officer Kelly asked numerous background questions about Joy and the others, she never asked Joy to relate his account of the incident wherein he allegedly threatened Mountain with a knife. Moreover, other than acknowledging that he and Mountain had an argument at the residence, Joy never made any incriminating statements and he never declined to answer any questions. Similar to Officer Kelly, Joy's demeanor was polite, cooperative, and talkative. Joy clearly wanted the officer to know about his version of the incident and that Mountain was wrongfully possessing his personal property.

11

*The Presence or Absence of Physical Restraint or Its Functional Equivalent, Such as Drawn Firearms or a Stationed Guard*

As previously described, Officer Kelly briefly displayed her handgun at the outset of the detention. Officer Kelly later testified that she drew her weapon because she was responding to reports of someone with a knife and she was the first officer to arrive to the scene. The officer also explained to Joy her safety concerns upon her initial arrival at the scene. Subsequently, however, and prior to questioning Joy, Officer Kelly did not exercise any physical restraint or contact with Joy as the two of them conversed in the street. Officer Kelly stood in close proximity to Joy when they conversed, but the other two officers generally stood away from Officer Kelly and near Jared and Mountain.

*Whether the Person Is Being Questioned as a Suspect or a Witness*

Joy's clothing generally matched the description of the suspect provided by a neighbor, who initially reported a knife-wielding man in a red shirt and jeans. Joy wore a maroon shirt and jeans, and had a sheathed knife that Officer Kelly promptly noticed upon stopping her vehicle at the scene.

At the suppression hearing, Officer Kelly testified that prior to Joy's arrest he was being detained because "I didn't know what was going on. I didn't know if he was for sure the suspect. I didn't know what was going on." Officer Kelly also indicated that she initially was explaining to Joy why the officers were there and why she drew her gun, but she denied interrogating him about the alleged crime. Instead, Officer Kelly testified that she was attempting to confirm Joy's identity. When asked by the prosecutor, "At any point [did] you interrogate the defendant on the incident, itself?" Officer Kelly replied, "No." The recordings corroborate Officer Kelly's testimony.

Officer Kelly focused her attention on Joy as a possible suspect of the reported crime. However, the nature of Officer Kelly's questions was more akin to that typically

asked of witnesses rather than suspects. Moreover, most of the questioning pertained to Joy's identification and background information related to other individuals at the scene. No accusatory questions were asked.

*Whether the Person Questioned Was Escorted by Officers to the Interrogation Location or Arrived Under His or Her Own Power*

At the time of Officer Kelly's arrival at the scene, Joy and Jared were standing in the front yard of the Mountain residence and both men initiated the encounter by voluntarily walking towards the officer as she stopped her vehicle.

*The Interrogation's Result, e.g., Whether the Person Was Allowed to Leave, Was Detained Further, or Was Arrested After the Interrogation*

Based on the identification information that Officer Kelly obtained from Joy, it was disclosed that Joy had an outstanding arrest warrant. The officer promptly arrested Joy on the basis of the warrant and placed him in her patrol vehicle. According to Officer Kelly, "I had no charges in reference to this case. When I placed him in my car, it was for the warrant."

*Application of the Eight Factors to this Case*

In applying the eight factors, it is important to note that "[n]o single factor outweighs another, nor do the factors bear equal weight. Every case must be analyzed on its own particular facts." *Lewis*, 299 Kan. at 835. In this case, applying the eight factors we are persuaded that Officer Kelly's questioning of Joy was investigatory and not custodial in nature.

In arriving at this conclusion, we highlight certain relevant factors. The location of the questioning was on a public street at the scene of a reported crime. As is typical of a

13

dispatched call, Officer Kelly had little information with unknown reliability as she arrived at the scene. The questioning of Joy was brief. Of particular significance in this case, Officer Kelly's demeanor was polite and her questions were generic and exploratory, focusing on identifying Joy and establishing his relationship to the other individuals at the scene. Importantly, the officer did not ask any questions designed to elicit an incriminating response. Indeed, any arguably incriminating information that Joy provided was not in response to Officer Kelly's questions but was spontaneously volunteered by him.

In concluding that Officer Kelly's questioning was custodial, the district court surmised that Joy was a suspect at the time of the questioning. This conclusion was based on Officer Kelly's display of a handgun and her orders to Joy at the initiation of the encounter. While relevant to the analysis, these facts are not determinative because "[t]he fact a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings." *State v. Warrior*, 294 Kan. 484, Syl. ¶ 6, 277 P.3d 1111 (2012). Moreover, Officer Kelly testified that she was not sure that Joy was the suspect at the time she arrived at the scene. Once backup officers arrived and Officer Kelly satisfied herself that Joy was unarmed, Officer Kelly did not frisk, pat down, handcuff, or even touch Joy—all common features of an arrest or custodial detention—while conversing with him.

The district court also concluded that Joy "would have discerned that he was not free to leave." This finding highlights the occasional difficulty courts have in determining whether, for Fifth Amendment purposes, a detention is investigatory or custodial.

Our court has squarely addressed this issue in a similar factual context in *Vanek*. In that case, a law enforcement officer conducted a driving while intoxicated (DUI) investigation after making a routine traffic stop. During the on-scene investigation, at which time the driver was briefly detained, the law enforcement officer asked questions

14

designed to elicit incriminating responses from the driver. In defense of the resultant DUI charge, Vanek sought to suppress his incriminating statements. The district court suppressed the statements concluding that Vanek was detained and not free to leave during the on-scene questioning and, thus, was questioned while in custody without the benefit of being advised of his *Miranda* rights. The State filed an interlocutory appeal.

In reversing the district court's suppression order, our court stated that courts have also recognized that a person can be seized without being under arrest, making the encounter an investigatory detention. *State v. Hill*, 281 Kan. 136, 142, 130 P.3d 1 (2006). Investigatory detentions, known as *Terry* stops, can occur when an officer reasonably suspects an individual is committing, has committed, or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct 1868, 20 L. Ed. 2d 889 (1968).

> "On the other hand, a person is considered under arrest by a law enforcement officer when that person is physically restrained or otherwise deprived of his or her freedom of action *in any significant way* or when he or she submits to the officer's custody for the purpose of answering for the commission of a crime. K.S.A. 22-2202(4); *Hill*, 281 Kan. at 143." (Emphasis added.) *Vanek*, 39 Kan. App. 2d at 533-34.

Under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the critical distinction between being detained and being in custody is a matter of degree. That is, has the individual been detained *in a significant way*? If so, a reasonable person would not feel free to terminate the interrogation and disengage from the encounter. Under these circumstances, the individual should be advised of and waive *Miranda* rights prior to any law enforcement questioning. As analyzed by our court in *Vanek*, however, an individual briefly detained during a *Terry* stop is not necessarily in custody for purposes of the Fifth Amendment. Rather, depending on the individual circumstances, that individual may submit to investigatory questioning without the necessity of law enforcement officers first obtaining a waiver of *Miranda* rights.

15

Applying *Vanek*'s teaching to the present case, it is apparent that while Joy was briefly detained during the *Terry* stop, given the brevity of the encounter on a public street, Officer Kelly's informal style, the lack of any restraints on Joy, and the general, non-incriminating nature of the officer's inquiries, Joy was not detained *in a significant way* so as to cause a reasonable person to conclude that he was under arrest, in custody, or could not terminate the questioning and disengage from the encounter.

In summary, we hold there was not substantial competent evidence to support the district court's legal conclusion that Joy was in custody at the time of Officer Kelly's questioning. The undisputed evidence shows that Officer Kelly engaged in investigatory questioning of Joy and, as a result, Officer Kelly was not required to advise him of his *Miranda* rights and obtain a waiver of those rights prior to questioning.

INCRIMINATING STATEMENT MADE WHILE IN CUSTODY

After Joy had been arrested, handcuffed, and secured inside Officer Kelly's patrol vehicle, he remained there while the officers completed their investigation into possible criminal charges involving Mountain and the taking of Bailey's infant into protective custody. It is undisputed that at this time Joy was under arrest and in custody. During the time that Officer Kelly transported Joy to the jail, the following conversation occurred:

> "[JOY:]  Now, do you know how the whole—uh—reason why—uh—I have a whole—my surety bond of—uh—fifteen-hundred?
> "[OFFICER KELLY:]  Yeah, um. And, to be honest with you, Dakota, you're also going to have another charge—
> "[JOY:]  For?
> "[OFFICER KELLY:]  Agg. assault.
> "[JOY:]  What's that?
> "[OFFICER KELLY:]  Aggravated assault.
> "[JOY:]  But I didn't—I didn't touch anybody.

16

"[OFFICER KELLY:] Oh, a neighbor saw you—and I think maybe has it on video—walking up to the house with knife in hand like this yelling.

"[JOY:] *Yes, I did have a knife in my hand*—

"[OFFICER KELLY:] Okay, okay, so that's—

"[JOY:] But I wasn't yelling.

"[OFFICER KELLY:] I'm just telling you what we have. Okay? That would be [for] a court to discuss.

"[JOY:] So that charge is going to keep me in jail?

"[OFFICER KELLY:] No, you can bond on it also.

"[JOY:] Oh." (Emphasis added.)

In suppressing all of the statements Joy made after his initial encounter with Officer Kelly, the district court did not separately analyze the incriminating statement Joy made to Officer Kelly while he was in custody and being transported to the jail. On appeal, the State argues, "Incriminating information from the Defendant came voluntarily without prompting . . . informing [Joy] why he was being arrested for aggravated assault, was not the functional equivalent of interrogation designed to elicit an incriminating response." Like the district court, on appeal, Joy does not separately analyze the constitutional propriety of the incriminating statement he made while traveling in the officer's patrol vehicle.

With respect to the statement Joy made in Officer Kelly's patrol vehicle, since Joy was under arrest and in custody, the only question before us is whether Joy was subjected to interrogation. An incriminating statement *volunteered* by a suspect while under arrest or in custody may be admissible even when no advice of *Miranda* rights or waiver of those rights has occurred. *State v. Warledo*, 286 Kan. 927, 936, 190 P.3d 937 (2008) (citing *State v. Lackey*, 280 Kan. 190, 225, 120 P.3d 332 [2005]).

For purposes of the Fifth Amendment, interrogation refers to express questioning and its functional equivalent, which means any words or actions (other than those

17

normally attendant to arrest and custody) that the police officer should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *Warledo*, 286 Kan. at 936. The test of whether a police officer should know that his or her words or actions are reasonably likely to elicit an incriminating statement is an objective one.

There are innumerable varieties of words or conduct which may fall within the functional equivalent standard articulated by the United States Supreme Court in *Innis*. In *Innis*, the Supreme Court concluded there was no interrogation requiring a *Miranda* waiver despite evocative comments police officers made to each other in the presence of the defendant. 446 U.S. at 301. In that case, police arrested Innis who was suspected of killing a taxi cab driver with a shotgun. Officers could not locate the shotgun itself but placed the suspect in the back of a patrol vehicle and transported him to the police station. During the drive, two officers—who sat in the vehicle with the defendant—spoke to each other about how there were many children with disabilities in the area and discussed the desirability of finding the shotgun so it would not fall into the children's hands and cause harm. The defendant responded to these comments with incriminating statements about the location of the shotgun. Despite the response these comments elicited, the Supreme Court ruled there was no direct questioning or its functional equivalent and, thus, no interrogation for purposes of the Fifth Amendment. 446 U.S. at 303.

On the other hand, the seminal "Christian burial" speech analyzed in *Brewer v. Williams*, 430 U.S. 387, 392, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977), provides an excellent example of words that are the functional equivalent of interrogation. Police officers in that case, knowing the defendant was deeply religious, mentioned to the suspect that it would be good to find the body of his victim so she could have a proper Christian burial. The defendant eventually responded, saying he would tell the police where the body was located. Although the Supreme Court decided *Brewer* on Sixth

18

Amendment grounds, authorities view the "Christian burial" speech as a prime example of comments meant to elicit an incriminating response from a defendant, for purposes of Fifth Amendment analysis. See 2 LaFave, Criminal Procedure § 6.7(c), p. 868-78 (4th ed. 2015).

In the present case, Joy's incriminating statement was made in the context of his questions to Officer Kelly about the amount of bond listed on the arrest warrant. In response, Officer Kelly advised Joy for the first time that he was also going to be charged with aggravated assault. When Joy questioned why he was being charged with that crime since he did not touch anyone, Officer Kelly briefly mentioned the factual basis for the charge. At this point, Joy volunteered that he had a knife during the incident but he challenged Officer Kelly's account which indicated he was yelling at the time. Of note, Officer Kelly did not continue the conversation or pursue any follow up questions about Joy's incriminating account. In fact, she interrupted Joy's voluntary admissions to inform him that this was a matter for him to discuss with the court. Joy then renewed his questions about posting bond.

Although it does not appear that Kansas appellate courts have addressed a situation similar to the present case, helpful guidance may be found in several federal circuit court opinions. For example, in *United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012), the Sixth Circuit found that no interrogation existed where officers gave the suspect an "accurate statement . . . concerning the nature of the charges to be brought." In *Collins*, police discovered an illegal firearm during a traffic stop. Both the driver and passenger denied knowledge of the weapon. Officers then told the men they would face gun charges, at which point the defendant stated that he would take the charge. The *Collins* court ruled the statements made by officers were not the functional equivalent of interrogation. 683 F.3d at 703.

Similarly, in *United States v. Blake*, 571 F.3d 331 (4th Cir. 2009), the Fourth Circuit found there was no interrogation when officers explained to the defendant why he was arrested. See also *United States v. Orr*, 636 F.3d 944, 954 (8th Cir. 2011) (upon defendant's assertion that officer did not have a valid warrant, officer assured defendant he did, "precisely the type of benign, informative comment envisioned . . . as not running afoul of *Miranda*"). Federal circuit courts have also found that an officer's response to a suspect's direct question does not constitute interrogation. *United States v. Briggs*, 273 F.3d 737, 740-41 (7th Cir. 2001); see *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014).

Applying United States Supreme Court and federal precedent, we are persuaded that Joy's incriminating statement, made while he was in custody, was not the result of Officer Kelly's questioning or its functional equivalent. The brief conversation about posting bond was initiated by Joy. In response, Officer Kelly appropriately advised Joy that he was also being charged with aggravated assault. Joy's questions about the nature of the charge were concisely answered by Officer Kelly, resulting in Joy's spontaneous admission to possessing a knife. No follow-up questions designed to evoke incriminating answers were asked by Officer Kelly. In context, Joy's incriminating statements were voluntarily and spontaneously made in the course of a conversation that he initiated about bond. There was no questioning or the functional equivalent by Officer Kelly.

Under these circumstances we hold there was no substantial competent evidence to support the legal conclusion that Joy's incriminating statement made in the officer's patrol vehicle was the result of questioning or its functional equivalent. Although Joy was in custody at the time, his volunteered statement should not have been suppressed as violative of the Fifth Amendment as interpreted by *Miranda*.

Reversed and remanded.

20